A10A1034. IN THE INTEREST OF C. H., a child.
A10A1409. IN THE INTEREST OF L. B. et al., children.
A10A1410. IN THE INTEREST OF C. H., a child.
(700 SE2d 203)

BLACKBURN, Senior Appellate Judge.

In these three cases involving orders of deprivation and of termination of parental rights regarding one or more of three children, Kayla Harris (the natural mother of all three children) and John Harris (the natural father of C. H.) appeal, arguing insufficiency of the evidence. Because some evidence showed that the children were deprived and that the other elements required to justify termination of parental rights were shown, we affirm in all three cases.

---

*Factual Background*

Construed in favor of the juvenile court's findings, the evidence showed that in 2004, 18-year-old Kayla engaged in consensual sex with John (a married man nearly 20 years her senior) and in nonconsensual sex with her cousin, eventually becoming pregnant by the cousin and giving birth to L. B. in June 2005. Kayla and L. B. then moved in with John and his wife, who were raising three older children. Kayla and L. B. would periodically return to relatives' homes for stretches of time, but then would come back to John and his wife. The three adults daily partook of illegal drugs such as cocaine and marijuana (indeed, John had earlier been convicted of drug dealing and had served his time) and engaged in group sex with each other, including sex for pay with others. Young Kayla later characterized John's behavior as sexually victimizing her.

(i) *Numerous acts of physical violence.* Over the next several years, John physically and emotionally abused Kayla (with her sometimes abusing him) on repeated occasions. Such occasions included the following:

(1) In December 2005, police responded to a domestic violence call at the residence, finding Kayla suffering from a ruptured eardrum and from numerous facial contusions and hematomas, including a black eye. She informed police that John had inflicted the injuries because he became angry when he discovered L. B. was not his child. She later denied the gravity of the incident so as to protect John from repercussions. Indeed, at the deprivation and termination hearings in 2009, she refused to even characterize this incident as "domestic violence."

(2) One month later in January 2006, police again were called, this time finding Kayla with bruising and complaining that John would not allow her to leave. Police recovered a CD that contained visual images of numerous sexual acts (recorded by John) between the three adults at the residence as well as of sexual acts performed by Kayla on various unidentified men. Another altercation between John and Kayla took place in February 2006 in the presence of L. B.

(3) In October 2006, police were again called when John refused to return L. B. to Kayla, following which incident Kayla moved to another residence. In November 2006, Kayla was sexually assaulted in an event arranged by John.

(4) Having become pregnant with H. H. by John, Kayla moved back in with John and his wife in January 2007, only to have John beat her again in February (in response to which she struck him). In that incident, he pushed her in the chest, grabbed her by the neck, slung her into the wall, and threatened to kill her. (She later minimized this incident, calling it merely an "argument" and

claiming that because no "marks" were found on her body, he did not hurt her. ) She went into early labor with H. H. and was admitted to a hospital, where tests showed she had ingested cocaine, barbiturates, and marijuana and where she was placed on suicide watch because of a history of self-mutilation and suicide attempts. John called her while she was in the hospital, successfully persuading her to lie to authorities about the incident with threats that she would otherwise be "taken to the looney bin" with her children being "auction[ed] off." Because evidence showed that all three adults were using cocaine regularly, DFCS took emergency custody of L. B. and of the three older children belonging to John and his wife.

(5) In May 2007, Kayla gave birth to H. H., at which time she told an investigator that John was abusive and that she was scared of him. She felt "trapped" with John. She later repeated these feelings to a psychologist. DFCS took emergency custody of H. H.

(6) In July 2008, police were called to the residence for domestic violence; Kayla had been wielding a knife, throwing things at John, and kicking him in the leg "about a dozen times." Police discovered that when Kayla had then locked herself in a bedroom, John had kicked a hole in the door and grabbed Kayla's arm, pulling her arm through the door and injuring her arm (nearly breaking it, as he described such to the 911 dispatcher). Kayla later recanted her allegations of violence by John, claiming she was never hurt. John would later describe this violent confrontation as only "an unfortunate incident."

(7) In August 2008, John's wife left the home, complaining that John had choked her and that Kayla had returned to live at the home. By December, John had divorced his wife; the *consent* divorce decree reflected that both John and his wife considered Kayla to be a danger to their three older children, and required that John and his wife prevent any contact between Kayla and their children.

(8) In November 2008, John saw Kayla at a restaurant. At this time, she was pregnant with C. H., again by John. He took her to his home, where she attacked him, hitting him in the head with a mop handle and kicking him in the groin. He responded by abusing her severely, striking her repeatedly with the mop handle until she was unconscious, whereupon he fled the residence without calling for medical assistance for her. Kayla later wandered to a nearby restaurant, where employees called police upon seeing her bleeding and swollen condition. She had numerous injuries, including a large cut over her right eye, two swollen eyes, a concussion, and bruises on her back and legs, which John at the termination hearing asserted were not "severe injur[ies]." An aggravated assault arrest warrant for John was issued, and when arrested for his actions, John confessed that he had struck Kayla with the mop handle.

Kayla immediately petitioned for a temporary protective order (TPO) to keep John away from her; in her petition, she swore under oath that over the preceding years, he had kicked, hit, slapped, choked, threatened, pushed, stalked, and verbally abused her, and that he had held her against her will and damaged her property. She specifically testified that he had engaged in the violent behavior in the presence of the children. An ex parte order against John issued immediately. Nevertheless, Kayla recanted and refused to appear and testify at the hearing on her petition for a TPO, resulting in the dismissal of the petition.

Tellingly, at the deprivation and termination hearings in 2009, Kayla recanted all allegations of violence, testifying that John had never been abusive toward her. Yet even John conceded that "there were fights. There were yelling, screaming matches. There were things thrown. There were wrestling matches. . . . At some point we've had physical altercations."

(ii) *Repeated refusals to obey court orders prohibiting contact between Kayla and John.* Because of the horrific history of violence between Kayla and John, numerous court orders prohibited John from having any contact with Kayla and vice versa. However, both parties ignored the orders at will.

(1) In April 2007, the juvenile court awarded custody of L. B. to DFCS, and specifically ordered that because of the repeated violent confrontations between John and Kayla, the two should have no contact whatsoever; the "no contact" requirement was repeated in Kayla's case plan that was designed to reunite her with L. B. The court found that both John and Kayla had often lied to the court to understate or deny the severity of the physical confrontations. Kayla and John remained in contact nevertheless.

(2) In June 2007, the juvenile court held a hearing on the status of the three older children begotten by John and his wife. Admitting to repeated cocaine abuse and domestic violence, John and his wife *consented* to a court order allowing DFCS to have custody of the three children based on John and his wife's substance abuse, and specifically prohibiting contact between John and Kayla, or between John's wife and Kayla. Nevertheless, Kayla returned to live at the married couple's residence.

(3) In September 2007, the juvenile court heard evidence of the contacts between the parties and concluded that John was in contempt for having wilfully violated the court's two orders. In November 2007, the court similarly found Kayla in contempt for having contacted John in violation of its April 2007 order.

(4) Despite these findings of contempt, John and Kayla continued to contact each other, resulting in yet another juvenile court

order in March 2008 prohibiting such contact. Later that same month, the court entered an order finding that the parties remained in contact despite the recent order. In a separate order, the court once again noted Kayla's contemptuous behavior and repeated its prohibition against Kayla's contacting John.

(5) In June 2008, the juvenile court entered an order regarding the three older children, finding that Kayla was a danger to these children, that Kayla had cut up the clothes of John's wife when that wife informed DFCS of Kayla's continued contact with John, and that John had admitted to violating the "no contact" orders. The court again ordered John to have no contact with Kayla. Nevertheless, John not only impregnated Kayla (resulting in C. H.'s birth in July 2009) but took Kayla to his home in November 2008 and beat her, as described above.

(6) Because of this November 2008 beating, John was arrested for aggravated assault against Kayla. As a condition of bond, the magistrate ordered John to have no contact with Kayla. In defiance of the bond condition, John contacted Kayla in December 2008 regarding Christmas presents for L. B. and H. H., began exchanging daily e-mail contact with Kayla in April 2009, and began physically seeing Kayla in May 2009 by going with her to prenatal visits with the doctor and to marital counseling sessions conducted by a minister. Both John and Kayla were keenly aware that such contacts violated the court's bond order.

(7) Despite the numerous other court orders prohibiting contact between John and Kayla, the two audaciously married each other and established a household together once the grand jury in June 2009 returned a "no bill" on John's aggravated assault charge (which "no bill" was not surprising since Kayla did not testify before the grand jury). According to their own appellate briefs, they have since their marriage allowed Kayla to have contact with John's three older children despite the express prohibition against such contained in the divorce decree to which John agreed.

(iii) *Other acts of parental unfitness.* In addition to the above, John and Kayla engaged in the following behavior over the years:

(1) They partook regularly of cocaine and of other illegal drugs until at least mid-2007. Kayla even ingested cocaine and marijuana while pregnant with H. H. Despite court orders and case reunification plans requiring John to abstain from alcohol, John continued to regularly drink alcohol several times a week.

(2) Kayla refused to complete the Level III inpatient drug treatment ordered repeatedly by the court, which treatment was also required by her case plan. Nor did she provide the income verification and suitable housing required by her case plan.

(3) John and Kayla took showers with L. B. and the three older children. Kayla walked around the house naked in front of these children, arguing with John.

(4) Kayla was diagnosed as suffering from a chronic post-traumatic stress disorder, a major depressive disorder, and battered woman's syndrome, creating an unhealthy environment for the children. She showed an inability to discern when her own physical and emotional health and that of her children were in jeopardy by maintaining a relationship with John, who was shown to be abusive by her own testimony. Specifically, an expert testified that if the children were returned to Kayla and John, there would be "a high risk that the children would tend to either assume an abusive or victim mentality because it's what they grew up learning." Furthermore, she admitted lying to the court and to covering up for John for fear that he would otherwise beat her. She tried to commit suicide. John was diagnosed as suffering from cocaine dependence, partner relational problems, an anxiety disorder, a depressive disorder, lack of impulse control, and an obsessive relationship with Kayla.

(5) Kayla consented to a court order finding that L. B. and H. H. were deprived and ordering DFCS to take custody of them. The court specifically found that L. B. was deprived due to emotional abuse, neglectful lack of supervision, inadequate housing, unstable employment, and exposure to an unhealthy living environment. John and his wife repeatedly testified that Kayla was a danger to their three older children. With the advice of counsel, John in 2008 consented to a formal termination of his parental rights to H. H.; the juvenile court soon thereafter found H. H. to be deprived because of John's abandonment and Kayla's substance abuse.

(6) Kayla has paid no child support while any of the children were in the care of DFCS, even though she was notified of her obligation to do so. Indeed, both parents even refused to pay the medical expenses they incurred in conjunction with the birth of C. H.

(7) John did not comply with his case plan regarding his reunification with his three older children. His ex-wife accordingly received primary custody of the children in the divorce decree.

### Procedural Background

Based on the above facts, DFCS took C. H. into custody on July 29, 2009 (about two weeks after the child's birth). On August 5, DFCS petitioned the juvenile court for a finding of deprivation regarding C. H. and for temporary custody. Following a three-day hearing on the petition, the court entered a lengthy and thorough order, setting forth the above facts and concluding that C. H. was deprived and should be in the custody of DFCS. Both John and Kayla

appeal this order in Case No. A10A1034.

The other two children of Kayla (L. B. and H. H.) have been in the custody of DFCS for some time: DFCS took custody of L. B. on February 28, 2007 when L. B. was just under two years old, and DFCS took custody of H. H. on May 18, 2007 when H. H. was one day old. On June 17, 2008, DFCS petitioned the court to terminate Kayla's rights to these two children.[1] In August 2009, DFCS petitioned the court to terminate her and John's rights to C. H. The court terminated Kayla's rights to all three children, which order she appeals in Case No. A10A1409. The court also terminated John's rights to C. H., which order he appeals in Case No. A10A1410.

### Case No. A10A1034

1. Case No. A10A1034 is John and Kayla's appeal of the juvenile court's order finding that C. H. was deprived and awarding temporary custody to DFCS. The criteria to be reviewed by the juvenile court are clear.

> OCGA §15-11-2 (8) (A) defines a deprived child as, inter alia, a child who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals. That definition focuses upon the needs of the child regardless of parental fault.

(Punctuation omitted.) *In the Interest of A. B.*[2] See *In the Interest of E. D.*[3] After finding a child is deprived, a juvenile court can only remove the child from the custody of the parents if it finds that "the deprivation resulted from unfitness on the part of the parent[s], that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Punctuation omitted.) *In the Interest of C. R.*[4] See *In the Interest of C. D. E.*[5]

Our review of the juvenile court's order deciding these matters is also clear.

> On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the

---

[1] John was not the father of L. B. and had voluntarily given up his rights to H. H.

[2] *In the Interest of A. B.*, 285 Ga. App. 288 (645 SE2d 716) (2007).

[3] *In the Interest of E. D.*, 287 Ga. App. 152, 157 (650 SE2d 800) (2007).

[4] *In the Interest of C. R.*, 292 Ga. App. 346, 351 (2) (665 SE2d 39) (2008).

[5] *In the Interest of C. D. E.*, 248 Ga. App. 756, 760-761 (1) (546 SE2d 837) (2001).

> juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. We neither weigh evidence nor determine the credibility of witnesses.

(Punctuation omitted.) *A. B.*, supra, 285 Ga. App. at 288. The evidence set forth above sufficed to sustain the juvenile court's findings of deprivation and also authorized that court to award temporary custody to DFCS.

First and foremost, the parents had engaged in a lengthy, persistent course of violent, confrontational conduct with each other over the years, sometimes in the presence of the children. The most recent documented incident occurred only months before C. H. was born, which incident was so brutal that their mutual beatings of each other with the mop handle had rendered Kayla unconscious, with the father fleeing without calling for medical assistance. John was charged with aggravated assault and only escaped an indictment when Kayla did not testify before the grand jury. Combined with the numerous other acts of domestic violence between the two, with John often being the aggressor, this incident justified the court in finding that such violence would continue and would have an adverse effect on C. H. See *E. D.*, supra, 287 Ga. App. at 158 ("[e]ven without testimony as to the effect on the children, the trial court was authorized to infer from the evidence that the . . . domestic violence in the home had an adverse effect on the minor children"). Here, the court even received expert testimony to this effect, and the record was replete with court orders repeatedly prohibiting contact between the violent parents. See *In the Interest of M. L.*[6] (deprivation found where mother "was living with a boyfriend who abused her, and she refused to leave that boyfriend despite counseling from professionals to do so"). Exacerbating these circumstances were Kayla's minimizing John's violent acts and her attempting to revise history (including her own previous sworn testimony) so as to protect John, which exhibited her inability or conscious refusal to protect C. H. from such an abusive environment. See *In the Interest of A. P.*[7] (despite a clear history of abuse by the stepfather, "the mother does not fully appreciate all that must still be done to protect and care for" the child; deprivation found). See generally *In the Interest of V. M. T.*[8] (juvenile court need not return child to mother until the child suffers seemingly inevitable harm).

---

[6] *In the Interest of M. L.*, 290 Ga. App. 437, 439 (1) (659 SE2d 800) (2008).

[7] *In the Interest of A. P.*, 299 Ga. App. 886, 889 (684 SE2d 22) (2009).

[8] *In the Interest of V. M. T.*, 243 Ga. App. 732, 736 (3) (534 SE2d 452) (2000).

Second, the court properly found that the couple's long and uninterrupted history of defying court orders showed they would not provide C. H. a safe environment, free from the violence that was repeatedly reported and documented. Where evidence shows that a parent violates a safety plan by placing a child in an abusive environment, a court may find deprivation and order loss of custody. See *A. B.*, supra, 285 Ga. App. at 290.

Third, Kayla refused to complete the inpatient drug treatment program ordered by the court, which was also a part of her case plan. Not obtaining the drug treatment required by the court is grounds for finding deprivation and for awarding temporary custody to DFCS. See *A. B.*, supra, 285 Ga. App. at 290. In defiance of the case plans, she further failed to provide income verification and of course to provide suitable housing by avoiding contact with John.

Fourth, both of Kayla's two older children were taken from her — with her consent — due to conditions of deprivation caused by the couple's history of drug abuse and violence. "The fact that appellant had two older children who were not in her care or supported by her indicates that she would likewise be unable to care for [C. H.] without supervision." (Punctuation omitted.) *A. B.*, supra, 285 Ga. App. at 290. Such are further grounds for finding deprivation and awarding custody to DFCS. Id. Cf. *In the Interest of J. L.*[9] ("it is a fair inference that use of cocaine by a parent has an adverse effect on a minor child").

As evidence supported its findings that C. H. was deprived as a result of misconduct by the parents, the juvenile court did not err in entering its order of deprivation and awarding temporary custody of C. H. to DFCS.

### Case Nos. A10A1409 & A10A1410

Case No. A10A1409 is Kayla's appeal of the termination of her rights to L. B., H. H., and C. H., and Case No. A10A1410 is John's appeal of the termination of his rights to C. H. Because many of the same arguments pertain to both cases, we consider them together.

2. The primary argument by Kayla and John in their respective appeals is that insufficient evidence supported the juvenile court's decision to terminate their parental rights. In this regard, the standard of review is clear.

> In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most

---

[9] *In the Interest of J. L.*, 269 Ga. App. 226, 229 (1) (603 SE2d 742) (2004).

favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Punctuation omitted.) *In the Interest of A. G.*[10]

In a termination of parental rights case, OCGA § 15-11-94 (a) requires the juvenile court to consider whether there is clear and convincing evidence of parental misconduct or inability as provided in subsection (b) of that Code section. If such is shown, then the court considers whether termination of parental rights is in the best interest of the child.

Subsection (b) of the statute sets forth four criteria that must be proven for the trial court to conclude that parental misconduct or inability is shown. Although the four criteria are separately listed, often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria. The four criteria that the court must find in order to hold that parental misconduct or inability is shown are:

> (i) The child is a deprived child, as such term is defined in Code Section 15-11-2;
>
> (ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived;
>
> (iii) Such cause of deprivation is likely to continue or will not likely be remedied; and
>
> (iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

OCGA § 15-11-94 (b) (4) (A).

(a) *Deprivation.* To show that the children were deprived under the circumstances here, DFCS was required to present evidence that the children were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals[.]" OCGA § 15-11-2 (8) (A). As explained in *In the Interest of*

---

[10] *In the Interest of A. G.*, 293 Ga. App. 383, 383 (667 SE2d 176) (2008).

*P. D. W.*,[11] where the children have been in DFCS's care, the correct inquiry is whether the children *would be* deprived if returned to the parent's care and control as of the date of the hearing.

Here, DFCS showed that all three children would be deprived if returned to Kayla's care and that C. H. would be deprived if returned to John's care. The court did not rely solely on the September 4, 2009 order of deprivation concerning C. H. (which order we affirm above) but made its own independent findings of fact that the children would be so deprived. As at the deprivation hearing, at the termination hearing the evidence showed the same four factors demonstrating that the children would be deprived: (i) the parents had engaged in a lengthy, persistent course of violent, confrontational conduct with each other over the years, sometimes in the presence of the children; (ii) the couple's long and uninterrupted history of defying court orders (in fact, they conceived C. H. and married each other despite orders of "no contact") showed they would not provide the children a safe environment, free from the violence that was repeatedly reported and documented; (iii) Kayla refused to complete the inpatient drug-treatment program ordered by the court and to complete other case plan requirements; and (iv) both of Kayla's two older children were taken from her — with her consent — due to conditions of deprivation caused by the couple's history of drug abuse and violence. As in the deprivation hearing for C. H., the evidence at the termination hearing showed deprivation of all three children, and we need not repeat all of this evidence and law in detail here.

(b) *Lack of parental care or control as cause of the deprivation.* The second criterion now comes into play. DFCS had to show that "[t]he lack of proper parental care or control by the parent in question is the cause of the child's status as deprived." OCGA § 15-11-94 (b) (4) (A) (ii). As stated in *P. D. W.*, supra, 296 Ga. App. at 193 (1) (b), the question is whether,

> *if returned to the parent as of the date of the hearing*, the child would return to a state of deprivation because of the parent's lack of proper parental care or control. In making this determination, the juvenile court focuses on the various factors as set forth in OCGA §§ 15-11-94 (b) (4) (B) and (b) (4) (C).

(Emphasis in original.)

---

[11] *In the Interest of P. D. W.*, 296 Ga. App. 189, 191 (1) (a) (674 SE2d 338) (2009).

The factors relevant to this case are found in two places. As to all three children, OCGA § 15-11-94 (b) (4) (B) (v) provides that a court may consider "[p]hysical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent." As to L. B. and H. H., OCGA § 15-11-94 (b) (4) (C) provides that

> where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: . . .
> (ii) To provide for the care and support of the child as required by law or judicial decree; and
> (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents. . . .

Here, L. B. was removed from the care of Kayla and John due to a long history of drug abuse and domestic violence. H. H. and C. H. were each respectively removed soon after birth on the ground that their sibling was still in DFCS custody and Kayla had not completed her case plan, including the required inpatient drug treatment (indeed, Kayla exposed H. H. to drugs while in utero) and the obtaining of suitable housing free from contact with the repeatedly-abusive John. Kayla paid no child support to DFCS for any of the children, and any counseling or parenting courses attended by the parents pursuant to a case plan were in vain, in light of their refusal to cease contact with each other despite the lengthy history of brutal domestic violence and abuse and despite numerous court orders and case plans prohibiting such contact. Indeed, within months after the most severe incident of abuse, the parents married; thus, the return of the children to such an abusive environment, where Kayla exhibited the classic signs of victimhood of returning to her abuser and defending that abuser's actions (if not denying those actions outright), reflected her and John's inability to provide suitable, safe housing free from violence and abuse. In light of this substantial evidence and related findings, John's complaint that the court also referred to John's admitted failure to comply with the case plan regarding his three older children is superfluous.

Evidence supported the juvenile court's finding that the lack of parental care or control caused the deprivation.

(c) *Cause of the deprivation is likely to continue.* DFCS was then required to show the third factor: "Such cause of deprivation is likely

to continue or will not likely be remedied." OCGA § 15-11-94 (b) (4) (A) (iii). As stated in *P. D. W.*, 296 Ga. App. at 194 (1) (c), "[t]his criterion focuses on whether, as of the date of the termination hearing, the parent is likely to continue conduct causing deprivation." If over the intervening years since Kayla lost custody of the older children to DFCS, Kayla and John have not overcome the issues that led to the original and continued removal of the children, then a court could find that the parents will continue to so act in the future and therefore that the cause of the deprivation will likely continue. Id. See *In the Interest of M. J. G.*[12] ("the juvenile court may consider the parent's past conduct in determining whether deprivation is likely to continue") (punctuation omitted). "Thus, repeated failure to comply with case plan goals may show that the cause of the deprivation is likely to continue." (Punctuation omitted.) *P. D. W.*, supra, 296 Ga. App. at 194 (1) (c). Here, DFCS showed just that and also that the parents simply would not comply with the "no contact" orders because they felt they knew better than the court, even though the court had received ample evidence of domestic violence between the two that placed the welfare of the children in danger.

Nevertheless, the parents point to their having refrained from reporting domestic violence for several months preceding the termination hearing. However, "in considering past deprivations compared to present achievements, juvenile courts are entitled to assign much less weight to such assertions of sudden parental fitness when compared to the other evidence." (Punctuation omitted.) *M. J. G.*, supra, 288 Ga. App. at 756. See *In the Interest of S. N.*[13] (juvenile court may find "that the parents' conduct over the years was a better predictor of their future conduct than a few months of partial stability"). See also *In the Interest of R. C. M.*[14] ("what weight to give recent improvements is a question for the trier of fact. In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation") (punctuation omitted).

The third criterion was met.

(d) *Likelihood of harm.* This brings us to the fourth criterion, namely whether "[t]he continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-94 (b) (4) (A) (iv). As stated in *P. D. W.*, supra, 296 Ga. App. at 195 (1) (d), "[t]his criterion is most often a syllogism" in that "deprivation" by definition usually means that

---

[12] *In the Interest of M. J. G.*, 288 Ga. App. 754, 755 (655 SE2d 333) (2007).

[13] *In the Interest of S. N.*, 291 Ga. App. 628, 632 (1) (a) (662 SE2d 381) (2008).

[14] *In the Interest of R. C. M.*, 284 Ga. App. 791, 796 (I) (3) (645 SE2d 363) (2007).

the child lacks the parental care or control necessary "for the child's physical, mental, or emotional health or morals" (OCGA § 15-11-2 (8) (A)), and therefore the continuation of that deprivation will likely cause serious physical, mental, emotional, or moral harm to the child. See *In the Interest of K. R.*[15] See also *In the Interest of D. L. T.*[16] ("[t]he same evidence that the child's deprivation is likely to continue . . . may also support a finding that a child will likely suffer serious harm from that continued deprivation"). "Thus, this fourth criterion is often met by satisfying the previous criteria." *P. D. W.*, supra, 296 Ga. App. at 195 (1) (d). See *S. N.*, supra, 291 Ga. App. at 632 (1) (a) ("[t]he same evidence showing that the children's deprivation was likely to continue also supported the court's finding that continued deprivation would cause the children serious physical, mental, or moral harm"). In any case, as with the previous criteria, "[t]he only logical inquiry as to section (iv) is whether the child *would be* harmed if returned to the parent's care and control, associated environment, and state of deprivation." (Emphasis in original.) *In the Interest of J. K.*[17]

Here, Kayla failed to address her drug problem with the mandated inpatient drug treatment, and both parents refused to comply with the various court orders requiring no contact between them so as to provide an environment free from the violent confrontations demonstrated over the years and recently. See *E. D.*, supra, 287 Ga. App. at 158 ("[e]ven without testimony as to the effect on the children, the trial court was authorized to infer from the evidence that the . . . domestic violence in the home had an adverse effect on the minor children"). An expert testified that the abusive, victimhood environment would seriously harm the children if they were returned to it. The evidence was sufficient to demonstrate that the children's continued deprivation would cause or would likely cause the children serious physical, mental, emotional, or moral harm. *P. D. W.*, supra, 296 Ga. App. at 196 (1) (d). See *In the Interest of D. W.*[18]

(e) *Best interests of the children.* We hold that the evidence discussed above supported the juvenile court's determination that the termination of John's and Kayla's parental rights was in the children's best interests "considering their physical, mental, emotional and moral condition and their need for a secure and stable home." (Punctuation omitted.) *In the Interest of T. H.*[19] See *In the*

---

[15] *In the Interest of K. R.*, 298 Ga. App. 436, 441-442 (1) (d) (680 SE2d 532) (2009).

[16] *In the Interest of D. L. T.*, 283 Ga. App. 223, 228 (2) (641 SE2d 236) (2007).

[17] *In the Interest of J. K.*, 278 Ga. App. 564, 567 (1) (629 SE2d 529) (2006).

[18] *In the Interest of D. W.*, 294 Ga. App. 89, 93 (1) (d) (668 SE2d 533) (2008).

[19] *In the Interest of T. H.*, 290 Ga. App. 421, 426 (2) (659 SE2d 813) (2008).

*Interest of R. S.*[20] ("[t]he same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest") (punctuation omitted).

Ample evidence supported the juvenile court's termination of Kayla's parental rights to the three children, and the termination of John's rights to C. H.

3. Both parents claim that the juvenile and magistrate courts had no authority to prohibit them from contacting each other. This argument fails on three fronts. First, we have affirmed juvenile court orders requiring no contact as one of the properly authorized "conditions and limitations" a court may prescribe when allowing a parent to retain custody of a deprived child under OCGA § 15-11-55 (a) (1). See *A. B.*, supra, 285 Ga. App. at 289, n. 1; *In the Interest of B. M.*[21] Similarly, OCGA § 15-11-55 (a) (2) (A) (iii) authorizes a court to impose such "conditions and limitations" when awarding custody of a child to DFCS. Cf. OCGA §§ 15-11-11 (a) (6); 15-11-57. Thus, the juvenile court was authorized in either instance to restrict contact between the parties. Second, John consented to at least one of the orders prohibiting such contact and cannot now complain about that order. See *Adamson v. Gen. Electric*[22] ("[i]nduced error is impermissible. A party cannot claim error where he himself committed or invited the error") (citation and punctuation omitted). Finally, one of the court orders prohibiting contact was a bond condition imposed by a magistrate court, which prohibition was expressly authorized by OCGA § 17-6-1 (f) (2). Accordingly, the juvenile and magistrate courts were fully authorized to prohibit contact between John and Kayla.

4. John raises the additional argument that before termination of parental rights was possible, DFCS was required by law to first attempt to reunify him with C. H. through a reunification plan. This argument is without merit. A presumption against the provision of reunification services arises when "[a]ny of the grounds for terminating parental rights exist, as set forth in subsection (b) for Code Section 15-11-94. . . ." As shown above, ample evidence supported a determination that such grounds existed at the time C. H. was taken into custody, which provided justification for DFCS to not pursue reunification efforts.

*Judgments affirmed. Barnes, P. J., and Senior Appellate Judge William LeRoy McMurray, Jr., concur.*

---

[20] *In the Interest of R. S.*, 270 Ga. App. 810, 812 (608 SE2d 286) (2004).

[21] *In the Interest of B. M.*, 252 Ga. App. 716, 717-718 (556 SE2d 883) (2001).

[22] *Adamson v. Gen. Electric*, 303 Ga. App. 741, 743 (2) (694 SE2d 363) (2010).

564

DECIDED JULY 19, 2010 — RECONSIDERATIONS DENIED
AUGUST 10, 2010 — 

Johnny E. Harris, *pro se.*
Kayla J. Harris, *pro se.*
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Penny Hannah, Assistant Attorney General, Sanders B. Deen,* for appellee.