708 S.E.2d 570 (2011)
In the Interest of M.S.S., a child.
No. A10A2314.
Court of Appeals of Georgia.
March 22, 2011.
*571 Jamie Lisa Smith, Marietta, for appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Sr. Asst. Atty. Gen., Kathryn Ann Fox, Asst. Atty. Gen., Sanders Buie Deen, Marietta, for appellee.
*572 BLACKWELL, Judge.
Following a hearing, the juvenile court entered an order terminating the parental rights of the mother of M.S.S.[1] The mother now appeals from that order, asserting that the juvenile court lacked jurisdiction to enter the termination order, that the evidence was insufficient to support certain of the juvenile court's factual findings, and that she received ineffective assistance of counsel. Because we find no merit in any of these claims, we affirm.
Viewed in the light most favorable to the juvenile court's findings,[2] the record shows that on September 18, 2007, Cobb County police found the mother and M.S.S., who was approximately 15 months of age at that time, in an apartment filled with marijuana smoke.[3] The Cobb County Department of Family and Children Services (the "Department") assumed temporary custody of M.S.S. two days later. The Department was awarded custody of M.S.S. based on the mother's stipulation that the child was deprived, given the mother's lack of stable housing and need for a substance-abuse assessment.
The Department then filed a deprivation petition, and in October 2007, the juvenile court entered an order finding M.S.S. to be deprived based on the mother's stipulation that the father had abandoned the child and that the mother then was incarcerated, lacked adequate and stable housing, and needed substance-abuse assessment and treatment. The order granted temporary custody of M.S.S. to the Department, specified reunification with the mother as the permanency plan, identified the prerequisites for reunification, and required the mother to keep the court informed of her whereabouts.[4] The order was entered nunc pro tunc to September 20, 2007 and provided that the award of temporary custody to the Department would expire on September 20, 2008, unless the order was "subsequently modified or amended."
The next year, the Department filed a motion for an order extending its temporary custody of M.S.S., and the juvenile court scheduled a hearing on that motion for September 11, 2008, nine days before the earlier custody order was set to expire. After the parents failed to appear at the scheduled hearing, the juvenile court entered an interim order, which extended the Department's temporary custody of M.S.S. until November 7, 2008,[5] and it scheduled another hearing for November 5, at which the court would revisit the question of an extension.
The mother also did not appear at the November 5, 2008 hearing. The juvenile court then granted the Department's motion to extend temporary custody, and it entered an order continuing M.S.S. in the Department's custody until November 5, 2009. In its order extending custody, the juvenile court noted that neither parent had appeared for the hearing and that both the mother and the father had effectively abandoned the child. Although the permanency plan remained reunification with the mother, the juvenile court observed that she had failed to make any progress on her case plan and that she had failed to maintain contact with M.S.S. The court, therefore, ordered the Department to investigate the possibility of terminating both the mother's and the father's parental rights.
The Department filed a second motion for an extension of custody on October 9, 2009, and a hearing on that motion was held on *573 November 5, 2009. The juvenile court granted the motion, finding that M.S.S. continued to be a deprived child and extending again the Department's custody of the child through November 5, 2010. The finding of deprivation as to the mother was based on her failure to maintain communication with the Department and her lack of progress on her case plan. Specifically, the court found that the mother had failed to address her substance-abuse problems and had failed to maintain stable housing or stable employment.
The Department also filed in October 2009 a petition to terminate the mother's parental rights, and the juvenile court set a hearing on this petition for February 24, 2010. Evidence presented at the termination hearing established that between September 2007 and November 2009, the mother's contact with M.S.S. had been sporadic. The mother had no contact whatsoever with M.S.S. between September and December 2007, while she was incarcerated following her conviction for loitering and prowling. Between December 2007 and August 2008, the mother had supervised visits scheduled every other week with M.S.S., but according to the child's court-appointed special advocate ("CASA"), the mother missed at least seven of the approximately seventeen scheduled visits and was late to a number of others. Between August 20, 2008 and December 3, 2008, the mother could not be located and made no attempt to contact the Department.
Later in December 2008, representatives of the Department met with the mother and learned that there was an outstanding warrant for her arrest for probation violations.[6] The Department caseworker explained to the mother that she would need to resolve her probation violations before continuing with her case plan. The mother eventually surrendered herself on the outstanding warrant in February 2009, after discovering that she was pregnant with her second child. She was incarcerated until April 1, 2009 and upon her release was placed in an intensive probation supervision program, which she completed in November 2009. There is no evidence in the record showing what contact, if any, the mother had with M.S.S. during the six months she was in intensive probation. Following her release from intensive probation, she was permitted unsupervised weekend visitation with M.S.S., but again, there is no indication in the record of the extent to which she actually visited with M.S.S. after November 2009.
The evidence also showed that the Department had reviewed the mother's case plan with her as early as February 2008. The plan remained unchanged during the two-and-a-half years leading up to the termination hearing. It required the mother to undergo a psychological evaluation and follow all recommendations made as a result of the evaluation, attend and successfully complete parenting classes, attend and successfully complete a drug-treatment program, submit to random drug screens, remain drug- and alcohol-free for six consecutive months, cooperate with and follow the recommendations of the Department family aid worker assigned to her, obtain and maintain a stable source of income sufficient to support the child, and obtain stable and safe housing large enough to accommodate the family. Although the Department caseworker testified that the entire plan could have been completed within six months (or by August 2008), the mother admitted that she made no effort at all to fulfill its requirements for more than a year, until after her second release from jail in April 2009. Specifically, the mother did not enter drug treatment until June 2009, did not complete that treatment until October 2009, and did not complete the required parenting classes until approximately July 2009. Although the mother did undergo a psychological evaluation in February 2008, shortly after receiving the case plan, her efforts to follow the recommendations resulting from that assessment still were listed as "ongoing" as of November 2009.
Despite making progress on other aspects of her case plan, the mother never maintained *574 stable housing or stable employment. After M.S.S. first entered the Department's custody, the mother claimed to be "self-employed," styling hair for friends and neighbors. She was employed in September and October 2009 as a telemarketer but was fired from that job. She remained unemployed from November 2009 until mid-February 2010, and she obtained a part-time job at a local fast-food restaurant only two days before the termination hearing.[7] Thus, the evidence showed that between September 2007 and February 2010, the mother held a full-time job for only two months.
The mother had a history of alternating between homelessness and unstable housing that depended on the kindness of third-parties. She admitted that she had been homeless before moving to Georgia in 2007 and that she was homeless at the time of her September 2007 arrest. Following her initial release from jail in November 2007, she lived at a friend's apartment until March 2008. Between March and June 2008, she lived with a brother, and from June 2008 until February 2009, when she was jailed on her probation violations, she was homeless. Following her release from jail in April 2009, she lived first with a friend, and then with the paternal grandmother of her second child, before moving to a transitional housing facility in September 2009. She remained at the transitional housing facility, where she was supposed to pay monthly rent of $500, until shortly before the termination hearing in February 2010. She successfully paid her own rent for September, October, and November 2009, but after losing her job, she was forced to rely upon assistance from a local charity to pay her rent for the months of December and January. Thus, between September 2007 and January 2010, the mother had paid rent for only three months.
Just before the termination hearing, the mother moved to a two-bedroom, one-bath apartment, which she rented for $495 per month. She paid the security deposit and rent for the first two months using money she received as part of her 2009 tax refund.[8] Also living with the mother at that apartment was her second child, who then was less than a year old. She was not married to the baby's father and received no child support for the baby. She did, however, receive $200 per month in food stamps for the baby, and she expected to receive the same amount for M.S.S., if M.S.S. were returned to her custody.
With respect to M.S.S., the evidence showed that the child had been in the same foster home since entering the Department's custody and that she had adapted well and was flourishing in that home. She had bonded with her foster mother, who expressed a desire to adopt the child. The CASA recommended termination of the mother's parental rights based on the mother's inability to obtain or maintain stable employment and stable housing and on M.S.S.'s need for permanency and stability.
Based on this evidence, the juvenile court found that M.S.S. was a deprived child, her deprivation resulted from a lack of parental care and control, her deprivation was likely to continue if custody were returned to the mother, and without termination of parental rights, the child would suffer serious physical, mental, emotional, or moral harm. The juvenile court further found that termination of the mother's parental rights was in the best interest of M.S.S., and it granted the Department's petition. The mother then filed an application for a discretionary appeal, which we granted. This appeal followed.
1. We first address the mother's assertion that the juvenile court lacked jurisdiction to enter the termination order. Her argument is based on OCGA § 15-11-58(n), which allows a court to extend a temporary custody order for an additional 12 months if:
(1) [a] hearing is held upon motion of the [Department] prior to the expiration of the order; (2) [r]easonable notice of the factual basis of the motion and of the hearing and *575 opportunity to be heard are given to the parties affected; and (3) [t]he court finds that the extension is necessary to accomplish the purposes of the order extended.
As noted above, the trial court scheduled a hearing on the Department's first motion for an extension of custody for September 11, 2008, nine days before the expiration of the earlier custody order. When neither parent appeared at the scheduled hearing, however, the trial court granted an "interim" extension of custody through November 7 and set another hearing for November 5 to address the question of a more prolonged extension. On appeal, the mother argues that no hearing was held on or before September 20, 2008 the date the original order was set to expireand that, as a result, the juvenile court lost jurisdiction of the case on that date, such that all orders entered after that date are void.[9] We disagree.
(a) By failing to appear at the timely-scheduled hearing, the mother waived the requirement that a hearing on the extension motion be held on or before September 20, 2008. This Court has previously said that even the "mandatory" procedural requirements of the juvenile court code can be waived in deprivation and termination proceedings by the affirmative conduct of a parent or her lawyer. In the Interest of A.S.O., 243 Ga.App. 1, 4(2), 530 S.E.2d 261 (2000); In the Interest of C.S., 236 Ga.App. 312, 315(2), 511 S.E.2d 895 (1999). In this case, the record shows that the juvenile court scheduled a timely hearing on the Department's motion for an extension, and the mother was served with notice of the hearing. The mother, however, failed to appear for the scheduled hearing, and in what we can only assume was an attempt to protect the mother's rights, the juvenile court set another hearing on the question of an extension and extended custody in the interim to preserve the status quo. We find that by failing to appear for a timely hearing of which she had notice, the mother waived the requirement of a hearing before the expiration of the earlier custody order. Accordingly, the juvenile court retained jurisdiction of the case after September 20, 2008, and its subsequent orders in the case are valid.
(b) In the alternative, even if the law did not permit the waiver of the requirement that a hearing be held before the original order expired, it would afford the mother no relief here. The juvenile court set a hearing for September 11, 2008, before the expiration of the earlier custody order. While we know that the mother failed to appear at that hearing, we do not know what else happened because no transcript of those proceedings is contained in the record on appeal. But for all we know, the juvenile court may have received evidence on September 11 sufficient to justify an extension of the award of custody to the Department, such that the juvenile court held a "hearing" within the meaning of OCGA § 15-11-58(n), albeit one that the mother chose not to attend. Because the mother bears the burden on appeal of demonstrating error, and because no transcript of the September 11 proceedings appears in the record, we must presume that whatever happened would justify the interim extension that the juvenile court ordered. See Code v. State, 255 Ga.App. 432, 433(2), 565 S.E.2d 477 (2002) ("Absent a transcript, we must assume the ruling of the trial court is supported by the evidence.") (citation and punctuation omitted); In the Interest of B.B.S., 253 Ga.App. 119, 120(3), 558 S.E.2d 447 (2001) ("The burden is on the appellant to show ... error affirmatively by the record.").
2. We now turn to the mother's claim that the evidence is insufficient to sustain the termination of her parental rights. "In considering a challenge to the sufficiency of the evidence in a termination of parental rights case, the question is whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's *576 rights to custody have been lost. [Cit.]" In the Interest of R.S., 287 Ga.App. 228, 228, 651 S.E.2d 156 (2007) (punctuation omitted). To prove that parental rights ought to be terminated, the Department first must prove "parental misconduct or inability" by clear and convincing evidence. OCGA § 15-11-94(a). Such proof requires the Department to establish that (1) the child is deprived; (2) the deprivation results from a lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. See OCGA § 15-11-94(b)(4)(A)(i)-(iv). Where the Department carries this burden, it then must prove that "termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child[,] including the need for a secure and stable home." OCGA § 15-11-94(a).
In this case, the mother does not challenge the juvenile court's findings that M.S.S. was deprived or that the lack of proper parental care or control was the cause of the deprivation. Rather, the mother argues only that the Department failed to prove that the deprivation was likely to continue, that any such continued deprivation would cause serious harm to M.S.S., and that termination of her parental rights was in the child's best interest. We address each of these contentions below.
(a) In support of her assertion that the Department failed to prove that the deprivation was likely to continue, the mother points to evidence showing that she recently had achieved some of her case-plan goals and was making progress on others. She also points to the fact that she successfully had maintained custody of her second child. Finally, the mother cites the testimony of the Department caseworker, who stated that she believed the mother could take M.S.S. home and successfully care for her.[10]
These arguments, however, ignore the fact that for two-and-a-half years, the mother failed to achieve two of the reunification plan's most important requirements: that she maintain stable housing and stable employment. The mere fact that the mother obtained housing about two weeks before the termination hearing, and had paid advance rent for two months, did not make that housing stable. In the Interest of T.V., 302 Ga. App. 124, 128(1), 690 S.E.2d 457 (2010). Nor did the evidence show that the mother had maintained stable employment or that her income was adequate to provide for M.S.S. Id. Indeed, the evidence shows that the mother was less successful at maintaining employment than housing. Although she had paid rent for five months since September 2007 (including the advance rent she paid on the apartment she obtained just before the termination hearing), she had maintained a full-time job for only two months during the same period. Furthermore, the job she had obtained in preparation for the termination hearing was part-time employment, and she had yet to actually work at that job. The mother's failure to make any significant progress toward achieving the goals of stable employment and stable housing, standing alone, was sufficient to support the juvenile court's finding that the cause of M.S.S.'s deprivation was likely to continue. See In the Interest of A.R., 302 Ga.App. 702, 709(1)(c), 691 S.E.2d 402 (2010); see also In the Interest of S.N.H., 300 Ga.App. 321, 327(1)(c), 685 S.E.2d 290 (2009); In the Interest of K.A.S., 279 Ga.App. 643, 650-651(1)(c), 632 S.E.2d 433 (2006).
Moreover, the mother's argument ignores the indisputable fact that the mother made no progress at all on her case plan for approximately 19 months, something that the juvenile court was obligated to consider. See OCGA § 15-11-94(b)(4)(C)(iii).[11] Even when *577 a parent makes some progress on a case plan just before a termination hearing, "the past conduct of the parent is properly considered by the court in determining whether [the child's] deprivation [is] likely to continue." In the Interest of M.J.G., 288 Ga.App. 754, 756, 655 S.E.2d 333 (2007) (citation and punctuation omitted). This is because "recent improvements do not establish that the parent is capable of maintaining the progress [and] the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." In the Interest of M.L., 290 Ga.App. 437, 441(3), 659 S.E.2d 800 (2008) (citations and punctuation omitted). Thus, despite the mother's recent compliance with some requirements of her case plan, the trial court was entitled to weigh that progress against the length of time it took her to comply, and it "was authorized to assign less weight to [her] assertion[] of sudden parental fitness based on [these] belated efforts" at compliance. In the Interest of D.L.T., 283 Ga.App. 223, 227(1), 641 S.E.2d 236 (2007).
As we have said time and again, "[i]n considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." In the Interest of T.W.O., 283 Ga.App. 771, 776-777(1)(a)(iii), 643 S.E.2d 255 (2007) (citation and punctuation omitted). "Likewise, judging the credibility of her good intentions was a task for the juvenile court." In the Interest of R.J.D.B., 305 Ga.App. 888, 893-894(1)(a), 700 S.E.2d 898 (2010) (citation and punctuation omitted). And on appeal, we will neither reweigh that evidence nor reevaluate the credibility of the witnesses. Id. Based on the evidence presented, the juvenile court was authorized to conclude that the cause of M.S.S.'s deprivation was likely to continue.
(b) We next consider the sufficiency of the proof that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to M.S.S. This Court has looked at the question of harm in two distinct ways. Only five years ago, our Court, sitting en banc, said that the relevant question is "whether the child would be harmed if returned to the parent's care and control, associated environment, and state of deprivation." In the Interest of J.K., 278 Ga.App. 564, 567(1), 629 S.E.2d 529 (2006) (en banc) (emphasis in original). Notwithstanding the decision of the en banc Court in J.K., however, some panels of our Court have framed the question differently in more recent cases, inquiring whether a continuation of the status quo-rather than the return of a child now in the custody of the Department to the custody of the natural parents-likely would harm the child. See, e.g., In the Interest of K.D.E., 288 Ga.App. 520, 526(1), 654 S.E.2d 651 (2007) (finding inadequate proof of harm where there was no evidence that child "was experiencing difficulties, such as behavioral or social issues, from being in foster care or that he would experience difficulties if a permanent placement was not put into place; and there was no testimony that a continued relationship with his mother would result in any potential or actual harm to the child"). In this case, we need not decide which is the correct standard. Under either standard, there is sufficient evidence of a likelihood of serious harm.
The evidence is sufficient to show that M.S.S. likely would suffer serious harm if she were returned to the custody and care of her mother and the state of deprivation that was likely to continue. The nature of the deprivation is enough proof, we think, to clearly and convincingly establish a likelihood of serious harm. See In the Interest of M.E.M., 272 Ga.App. 451, 455, 612 S.E.2d 612 (2005) (likelihood of harm proved by evidence showing that mother had no stable income or housing, had no parental bond with the children, and had made no effort to provide any kind of support for children while they were in DFACS custody); In the Interest of S.L.B., 265 Ga.App. 684, 688, 595 S.E.2d 370 (2004) (mother's history of drug abuse, criminal conduct, and incarceration, even after losing custody of her child, together with her failure to obtain employment, provide financial *578 support, or establish a parental bond with the child, showed a likelihood of harm). Indeed, we think the proposition that a lack of stable housingpunctuated by periods of homelessness and the incarceration of the motherand a lack of a stable income to provide for the necessaries of life pose a risk of serious harm to a child of tender years is not seriously debatable.[12] The CASA confirmed that returning M.S.S. to her mother would pose a substantial risk of harm to the child, considering the child's need for a stable home environment.
The evidence also is sufficient to establish a likelihood that a continuation of the status quo would seriously harm M.S.S. At the age of three years and eight months, M.S.S. had been in foster care for two-and-a-half years, approximately two-thirds of her life. As a result, according to the CASA, the child had formed a parental bond with her foster mother, who wanted to adopt M.S.S. The CASA, who had observed M.S.S. visiting with her mother on several occasions, explained that M.S.S. did not appear to have a similar bond with her mother. To the contrary, the mother seemed more like an older sister than a parent to M.S.S., playing games with the child and styling her hair, but never inquiring about the health, development, or progress of the child. The foster mother testified that, although M.S.S. seemed to enjoy short visits with her mother, visiting with the mother for more than an hour or so made the child "quite upset." Before longer visits, M.S.S. would cry and complain of stomachaches, and afterward, she would be "crabby," "argumentative," and "out of sorts."
After hearing this evidence, and after observing that long-term foster care with no permanency is "a recognized harm," the juvenile court found that a continuation of the status quo likely would be detrimental to M.S.S. The court also found that, because M.S.S. had "bonded" with her foster mother in a "parent-child relationship," the child would suffer "significant emotional harm" if that bonding were disrupted by efforts to force upon M.S.S. a continued relationship with her natural mother. The evidence supports the juvenile court's findings, and it sustains the conclusion that M.S.S. likely would suffer serious harm from continued maintenance of the status quo. See In the Interest of J.L.C., 292 Ga.App. 763, 768, 666 S.E.2d 98 (2008) (finding of harm supported by evidence that child had been in foster care since birth, prolonged foster care would be harmful to the child, and no parental bond existed between child and biological parent); In the Interest of T.C., 282 Ga.App. 659, 663(2), 639 S.E.2d 601 (2006) ("This Court has previously ruled that where, as here, the evidence showed no parental bond between parent and child, the child had adapted well to foster care, and the foster parent wished to adopt, this was sufficient to support the juvenile court's conclusion that continued deprivation was likely to harm the child.") (citation and punctuation omitted).
(c) The mother also asserts that the evidence is insufficient to support a finding that termination of her parental rights was in the best interest of M.S.S. The mother fails to support this enumeration in her brief, however, with any reasoned argument, citation of authority, or record citations. Accordingly, this claim of error is deemed abandoned. Gooch v. Tudor, 296 Ga.App. 414, 422(3), 674 S.E.2d 331 (2009). See also R.S., *579 287 Ga.App. at 232(2), 651 S.E.2d 156; Court of Appeals Rule 25(c)(2).
3. Finally, we address the mother's claim that she was deprived of the effective assistance of counsel at the termination hearing. "[A] juvenile court's finding that a parent has been afforded effective assistance of counsel will be affirmed on appeal unless that finding is clearly erroneous." S.N.H., 300 Ga.App. at 330(5), 685 S.E.2d 290. We find no error in this case.
To prevail on her claim of ineffective assistance of counsel, the mother must prove both that the performance of her lawyer was deficient and that she was prejudiced by this deficient performance. S.N.H., 300 Ga.App. at 329(5), 685 S.E.2d 290. To prove that the performance of her lawyer was deficient, the mother must show that her lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. In the Interest of A.H.P., 232 Ga.App. 330, 334-335(2), 500 S.E.2d 418 (1998). And to prove that she was prejudiced by the performance of her lawyer, the mother must show "a reasonable probability that, absent counsel's unprofessional errors, the result of the [termination proceeding] would have been different." Id. at 335(2), 500 S.E.2d 418. We think the mother has failed to carry her burden.
As best we can tell from her brief, the mother asserts that her lawyer was ineffective for two reasons. First, the mother claims that the lawyer should have appealed from, or otherwise objected to, the allegedly void orders entered after September 20, 2008. As discussed in Division 1, supra, however, the juvenile court never lost jurisdiction of this case, and those orders are, therefore, valid. Given that trial counsel's failure to pursue a meritless or futile objection, motion, or appeal cannot constitute ineffective assistance, the mother's lawyer was not ineffective for failing to object to or appeal the juvenile court's orders on jurisdictional grounds. See, e.g., Smith v. State, 302 Ga. App. 128, 135(2)(a), 690 S.E.2d 449 (2010).
The mother also claims that her lawyer should have appealed from the finding of deprivation contained in the order entered after the November 2009 hearing on the second motion to extend custody. She argues that the failure to appeal this finding meant that she was bound by it, and she says that it was this finding of deprivation that supported the termination of her parental rights. In other words, the mother claims that the failure to appeal this finding of deprivation relieved the Department of having to prove at the termination hearing that M.S.S. was currently a deprived child. This argument misapprehends the law.
The mother is correct that "[a]n unappealed order adjudicating a child deprived does indeed bind a parent to the finding that at the time of the order the child was deprived for the reasons given in the order." In the Interest of K.R., 298 Ga.App. 436, 438(1)(a), 680 S.E.2d 532 (2009) (citation and punctuation omitted; emphasis in original). The parent's failure to appeal a finding of deprivation, however, does not relieve the Department of the obligation to prove current deprivation in a subsequent proceeding. In the Interest of P.D.W., 296 Ga.App. 189, 192-193(1)(a), 674 S.E.2d 338 (2009). To prevail on the termination petition, therefore, the Department was obligated to prove that, as of the date of the termination hearing, M.S.S. was a deprived child.[13] Accordingly, the failure to appeal the finding that M.S.S. was deprived as of November 5, 2009 did not preclude the mother from arguing at the termination hearing that M.S.S. was not currently *580 deprived. Nor did it preclude the mother from challenging on appeal the finding of deprivation on which the juvenile court based the termination of parental rights. Even assuming that the mother's lawyer should have appealed from the November 2009 finding of deprivation, the mother has not shown that she was prejudiced by the failure to do so.
For the reasons set forth above, we affirm the order of the juvenile court terminating the mother's parental rights to M.S.S.
Judgment affirmed.
BARNES, P.J., concurs.
DILLARD, J., concurs fully as to Division 1 and concurs specially as to Divisions 2 and 3.
DILLARD, Judge, concurring fully and specially.
I concur fully in Division 1 of the majority's opinion.[14] And while I agree with the majority's conclusion that the juvenile court could have found that present clear and convincing evidence warranted the termination of the natural mother's parental rights, I do not entirely agree with its reasoning for doing so and therefore specially concur as to Division 2 of the opinion.
Specifically, I do not agree with the majority's assertion that a natural parent's rights can be terminated merely because the mother failed to satisfy certain elements of the State's reunification plan (e.g., securing stable employment and housing), or because she was not financially or emotionally capable of parenting her child at the time of the termination hearing. Nevertheless, I do agree with the majority that the juvenile court was correct in terminating the mother's parental rights because the record evidence shows, clearly and convincingly, that the ongoing parental relationship between the mother and M.S.S. is likely to cause the child serious, actual harm if permitted to continue. As the majority notes, "the mother for long periods of time had put her own desires ahead of the best interest of her daughter, which manifested in ... her lackluster efforts to maintain contact and establish a parental relationship with the child."
As our Supreme Court has previously explained, it is one thing if a parent desires to care for his or her child but simply lacks the financial wherewithal or emotional capability to do so, and quite another for a parent to wilfully disregard or abandon his or her parental duties.[15] Because I believe that the case sub judice is far closer to falling into the latter category rather than the former, I agree that termination of the mother's parental rights was constitutionally and statutorily permissible.
Finally, I likewise specially concur as to Division 3 of the opinion. While I agree with the majority's conclusion that the natural mother was not deprived of effective assistance of counsel at the termination hearing, I do not agree with all of the underlying reasoning employed by the majority in reaching this determination. As such, I concur only in the majority's ultimate conclusion that the mother was afforded effective assistance of counsel below.
NOTES
[1] The juvenile court also terminated the parental rights of the father, but he is not a party to this appeal.
[2] In the Interest of R.S., 287 Ga.App. 228, 228, 651 S.E.2d 156 (2007).
[3] On September 25, 2007, police arrested the mother, and she later was indicted for loitering and prowling in violation of OCGA § 16-11-36(a) and for possession of methamphetamine in violation of OCGA § 16-13-30(a). In November 2007, the mother pled guilty to both charges and was sentenced to four months in jail on the loitering and prowling charge and four years probation on the drug charge.
[4] Specifically, the order provided that any reunification plan must require the mother to resolve "all aspects of her criminal arrest," undergo a substance-abuse evaluation and complete all treatment recommendations, and maintain stable housing and employment.
[5] This interim order was entered on November 26, 2008, nunc pro tunc to September 11.
[6] The probation violations included the mother's failure to maintain gainful employment, to keep the probation office advised of her residence, to obtain a drug and alcohol evaluation, and to pay certain court-ordered monies.
[7] This job paid the minimum wage, and although the mother had not yet started working there, she expected that she only would work 25 to 30 hours per week.
[8] Evidence showed that the mother's total income for 2009, including her self-reported income for styling hair, was $9,500.
[9] In support of this argument, the mother cites In the Interest of B.G., 231 Ga.App. 39, 497 S.E.2d 572 (1998). That case, however, is inapposite. There we found that the juvenile court lacked jurisdiction to extend an order of temporary custody because the Department did not even seek an extension and the court set no hearing on the extension issue until several months after the earlier order had expired. Id. at 40, 497 S.E.2d 572. In this case, however, the Department filed a timely motion for an extension of custody and the juvenile court scheduled and tried to hold a timely hearing on that motion.
[10] The mother also cites the caseworker's testimony that if M.S.S. were returned to the mother as of the date of the termination hearing, the caseworker did not think that the child would be deprived. That testimony, however, goes to the finding that M.S.S. was, at the time of the termination hearing, a deprived child. See In the Interest of P.D.W., 296 Ga.App. 189, 191-192(1)(a), 674 S.E.2d 338 (2009). On appeal, the mother has not challenged that finding, and she is therefore bound by it.
[11] OCGA 15-11-94(b)(4)(C)(iii) provides that, in a termination of parental rights proceeding, a trial court "shall consider ... whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights ... [t]o comply with a court ordered plan designed to reunite the child with the parent or parents." (Emphasis supplied.).
[12] That is not to say that a lack of stable housing and income always demands a finding that serious harm is likely. We suppose that an uncommonly resilient child, an older child, or the extraordinary efforts of an unusually devoted and loving parent might avoid the harm that otherwise likely would follow such deprivation. But here, the mother for long periods of time had put her own desires ahead of the best interest of her daughter, which manifested in her failure to make timely progress on her case plan, her violations of the criminal laws and conditions of her probation, the periods of incarceration that followed, and her lackluster efforts to maintain contact and establish a parental relationship with the child. Although the mother recently had made some progress on her case plan, the juvenile court was entitled to consider her history as indicative of her attitudes about parenting. These considerations, although not necessary to prove a likelihood of serious harm, tend to confirm it, inasmuch as they offer no reason to believe that this mother was capable of, or willing to undertake, extraordinary efforts to shield her young child from the serious harm that otherwise is likely to result from continued deprivation.
[13] "Where [a child has] been removed from parental custody, the Department may prove current deprivation by showing that, if the child were returned to the parents at the time of the hearing, [she] would be deprived." In the Interest of T.V., 302 Ga.App. at 127(1), 690 S.E.2d 457 (citation and punctuation omitted). See also In the Interest of C.H., 305 Ga.App. 549, 559(2)(b), 700 S.E.2d 203 (2010) ("the question is whether, if returned to the parent as of the date of the hearing, the child would return to a state of deprivation because of the parent's lack of proper parental care or control") (citation and punctuation omitted; emphasis in original). Current deprivation "may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing." In the Interest of Z.H.T., 302 Ga.App. 424, 429(1)(a), 691 S.E.2d 292 (2010).
[14] Because I agree with all that is said in Division 1 of the majority's opinion, the reasoning and holding contained therein is to be treated as binding precedent of this Court and is not to be considered as merely physical precedent.
[15] See Thorne v. Padgett, 259 Ga. 650, 651, 386 S.E.2d 155 (1989).