# WHOLE COURT

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A1536. IN THE INTEREST OF B. R. F., a child.

PHIPPS, Chief Judge.

In granting a mother's out-of-time application for discretionary appeal of the termination of her parental rights to her minor child, B. R. F., citing *In the Interest of S. M. B.*,[1] we asked the parties to address in their appellate briefs the question of whether this court has jurisdiction to grant the out-of-time appeal. We conclude that, under the circumstances of this case, this court has jurisdiction to grant an out-of-time application for discretionary appeal from an order terminating parental rights. And for the reasons set forth herein, we affirm the trial court's termination of the mother's parental rights.

---

[1] 319 Ga. App. 125 (735 SE2d 122) (2012).

1. In this case, a constitutional violation concerning the appeal occurred when the mother's right to file an application for discretionary appeal with the assistance of a court-appointed attorney was frustrated because of the ineffective assistance or denial of counsel; therefore, this court has jurisdiction to grant the out-of-time application for discretionary appeal from the order terminating the mother's parental rights.

During the termination hearing, which began on December 5, 2012 and concluded on December 13, 2012, the mother was represented by counsel appointed pursuant to a conflict contract through the Griffin Circuit Public Defenders Office. Upon the conclusion of the hearing, the mother's counsel sent the mother a letter in response to a call the mother had made to counsel's office. Counsel informed the mother that it was his

> understanding from the circuit Public Defender, [name] that you are not entitled to indigent defense for a discretionary appeal of a civil case (termination of parental rights). You can file a private appeal with out indigent defense counsel within thirty days from the entry of final judgment. The final order should be entered within the next week. It should be noted as well that my contract with the Public Defenders Office does not include appellant [sic] work and any appeal or further action on this case would require appoint [sic] of another attorney.

2

Counsel further informed the mother that he was closing his file of the case, and that if she had any further questions, she should direct them to the county public defenders office. On January 14, 2013, the trial court entered an order terminating the mother's parental rights.

The mother, acting pro se, timely filed a direct appeal from the juvenile court's order; but the juvenile court dismissed the notice of appeal due to the mother's failure to follow the discretionary appeals procedure.[2] On September 16, 2013, the mother, with the assistance of new counsel, filed an out-of-time application for discretionary appeal.

"It is the duty of this court to raise the question of its jurisdiction in all cases in which there may be any doubt as to the existence of such jurisdiction."[3] Pursuant to OCGA § 5-6-35 (d), an application for a discretionary appeal must be filed within 30 days of the entry of the order being appealed.[4] And an indigent parent has a

---

[2] See OCGA § 5-6-35 (a) (12), (d).

[3] *Rowland v. State*, 264 Ga. 872 (1) (452 SE2d 756) (1995) (citation and punctuation omitted).

[4] OCGA § 5-6-35 (d).

statutory right to the appointment of counsel to appeal an order terminating his or her parental rights.[5]

In *In the Interest of S. M. B.*,[6] this court held that a *trial court* had no authority to grant an out-of-time discretionary appeal application from a termination of the

[5] See former OCGA § 15-11-98 (2012), which was in effect at the time of the termination proceeding ("(a) In any proceeding for terminating parental rights or any rehearing or appeal thereon, the court shall appoint an attorney to represent the child as the child's counsel and may appoint a separate guardian ad litem or a guardian ad litem who may be the same person as the child's counsel. (b) If the parent or parents of the child desire to be represented by counsel but are indigent, the court shall appoint an attorney for such parent or parents . . . ."). See also *Nix v. Dept. of Human Resources*, 236 Ga. 794, 796 (225 SE2d 306) (1976) ("It is . . . quite evident that the entire legislative scheme written into the pertinent provisions of the Juvenile Code was intended to provide to an indigent parent effective representation at all stages of any proceeding involving the termination of that parent's right to his or her child" including for appeal); *Dell v. Dell*, 324 Ga. App. 297, 302 (2) (748 SE2d 703) (2013) ("An indigent parent has a statutory right to effective legal representation in termination proceedings. Moreover, an indigent parent whose parental rights have been terminated is entitled to a paupered copy of the transcript for use in appealing the decision of the trial court.") (citations and punctuation omitted); *In the Interest of B. C. P.*, 229 Ga. App. 111, 116 (3) (493 SE2d 258) (1997) (an indigent mother is entitled to court-appointed counsel to appeal a determination of deprivation). And see former OCGA § 15-11-6 (b) (2012) (a "party is entitled to representation by legal counsel at all stages of any proceedings alleging . . . deprivation, and if, as an indigent person, a party is unable to employ counsel, he or she is entitled to have the court provide counsel for him or her.").

[6] Supra.

applicant's parental rights.[7] Citing *Gable v. State*,[8] the court recognized, however, that "an appellate court may, at its discretion, permit an out-of-time discretionary appeal where a constitutional right is at stake."[9] Indeed, in *Gable*, the Supreme Court of Georgia held that "Georgia Courts may excuse compliance with a statutory requirement for appeal only where necessary to avoid or remedy a constitutional violation concerning the appeal."[10]

In *In the Interest of S. M. B.*,[11] this court rejected the notion of correlating a parent's right to an out-of-time appeal on ineffectiveness grounds to that of a criminal defendant.[12] The court recognized, as stated by the Georgia Supreme Court, that

> [o]ut-of-time appeals are designed to address the constitutional concerns that arise when a criminal defendant is denied his first appeal of right because the counsel to which he was constitutionally entitled to assist him in that appeal was professionally deficient in not advising him to file a timely appeal and that deficiency caused prejudice. . . . However,

---

[7] *In the Interest of S. M. B.*, supra at 128.

[8] 290 Ga. 81 (720 SE2d 170) (2011).

[9] *In the Interest of S. M. B.*, supra at 126-127.

[10] *Gable*, supra at 85 (2) (b).

[11] Supra.

[12] *In the Interest of S. M. B.*, supra at 127.

for an out-of-time appeal to be available on the grounds of ineffective assistance of counsel, the defendant must necessarily have had the right to file a *direct appeal*.[13]

The court concluded that "[t]he [parent] did not have the right to file a direct appeal in this case, and so no out-of-time appeal is available on ineffective assistance grounds."[14] In context, however, it is apparent that by "direct appeal," the Supreme Court of Georgia meant simply a first appeal, i.e., an appeal not taken by discretionary or mandatory review "beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court."[15]

---

[13] Id. (quoting *Stephens v. State*, 291 Ga. 837 (2) (733 SE2d 266) (2012) (emphasis omitted; emphasis supplied).

[14] *In the Interest of S. M. B.*, supra.

[15] *Douglas v. California*, 372 U. S. 353, 356 (83 SCt 814, 9 LE2d 811) (1963); see *Evitts v. Lucey*, 469 U. S. 387, 402 (III) (B) (105 SCt 830, 83 LE2d 821) (1985), citing *Ross v. Moffitt*, 417 U. S. 600, 602-605, 609-612 (I), (III), (IV) (94 SC 2437, 41 LE2d 341) (1974) (holding that, following a direct appeal of right, a criminal defendant has no constitutional right to counsel to pursue further discretionary state appeals and applications for review by the United States Supreme Court).

In *Gable*,[16] the Supreme Court of Georgia held that "[t]here is no constitutional right to counsel, much less the effective assistance of counsel, in filing or litigating a post-conviction extraordinary motion for new trial or a discretionary application to appeal the ruling on such a motion."[17] In *Gable* the remedy of an out-of-time application was not available because no violation of the defendant's constitutional rights had occurred when counsel rendered ineffective assistance by failing to file a timely application for discretionary appeal; as in *Ross v. Moffitt*,[18] the defendant's convictions in *Gable* had been previously affirmed on direct appeal, and the defendant had the assistance of counsel in pursuing the prior appeal.[19] The application for discretionary review in this case is not like the applications in *Ross* or *Gable*, which applications had been taken for the purpose of *further* appellate review, following first direct appeals as of right.

---

[16] Supra.

[17] *Gable*, supra at 86 (2) (c) (citations omitted).

[18] Supra.

[19] *Gable*, supra at 82 (1).

7

In *Douglas v. California*,[20] the United States Supreme Court held that the Fourteenth Amendment guarantees a criminal defendant the right to counsel on his "*first appeal,* granted as a matter of right,"[21] and in *Evitts v. Lucey*,[22] the United States Supreme Court held that that right to counsel included the right to the effective assistance of counsel.[23] The rationale was that although the

> Constitution does not require States to grant appeals as of right to criminal defendants seeking to review alleged trial court errors[,] . . . if a State has created appellate courts as "an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant," the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.[24]

In *Douglas*,[25] the United States Supreme Court stated that "where the merits of the *one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor,"

---

[20] Supra.

[21] *Douglas*, supra at 356 (emphasis in original).

[22] Supra.

[23] *Evitts*, supra at 392, 404 (II), (III) (C).

[24] Id. at 393 (II) (A) (citations omitted).

[25] Supra.

and, as to the indigent, "the right to appeal does not comport with fair procedure."[26] "'Due Process' emphasizes fairness between the State and the individual dealing with the State[.]"[27] "[T]he phrase expresses the requirement of 'fundamental fairness[.]'"[28]

In the context of termination of parental rights cases, the discretionary appeal process *is* the one and only first appeal as of right. First, although the United States Constitution does not require states to appoint counsel for indigent parents in termination proceedings,[29] as previously set forth, in Georgia the right to court-appointed counsel for an indigent parent in termination proceedings includes the appellate process. Second, in *In the Interest of A. C.*,[30] the Supreme Court of Georgia said that the state has a "legitimate interest in not permitting children determined to be deprived to languish in temporary care, but instead, to leave this situation for permanent stable homes as expeditiously as possible,"[31] and that the discretionary

---

[26] *Douglas*, supra at 357.

[27] *Evitts*, supra at 405 (III) (C) (punctuation and footnote omitted).

[28] *Lassiter v. Dept. of Social Svcs. of Durham County*, 452 U. S. 18, 24 (II) (101 SCt 2153, 68 LE2d 640) (1981).

[29] Id. at 31 (II) (C).

[30] 285 Ga. 829 (686 SE2d 635) (2009).

[31] Id. at 834 (2) (citation omitted).

appeal process provided in OCGA § 5-6-35 (a) (12) "helps accomplish this goal by offering effective appellate review in an expedited manner, yet permitting a full appeal of the termination of parental rights if that is shown to be warranted."[32]

The United States Supreme Court stated:

> In *Lassiter*, it was not disputed that state intervention to terminate the relationship between a parent and the child must be accomplished by procedures meeting the requisites of the Due Process Clause. The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.[33]

The dissenting opinion misses the mark when it focuses on whether the appeal rights in this case were granted by statute or by either the state or federal constitution. As Justice Harlan remarked in *Douglas* about the due process issue: "The real question in this case, I submit, and the only one that permits of satisfactory analysis, is whether or not the state rule, as applied in this case, is consistent with the requirements of fair procedure guaranteed by the Due Process Clause."[34] Here, the state rule was not

---

[32] Id.

[33] *Santosky v. Kramer*, 455 U. S. 745, 753-754 (II) (102 SCt 1388, 71 LE2d 599) (1982) (citations and punctuation omitted).

[34] *Ross*, supra at 609-610 (III).

applied consistent with the requirements of fair procedure guaranteed by the Due Process Clause.

It is evident that the Georgia legislature incorporated the discretionary application appeal procedure as an integral part of the system for finally adjudicating termination of parental rights cases, and this system, which entitles indigent parents to court-appointed counsel for appeals and provides appellate review of termination orders and a possibility for a full appeal, must be applied in accordance with the requirements of fair procedure guaranteed by the Due Process Clause of the Constitution.[35] But in this case, the system did not comport with the Due Process Clause. In this case, an indigent person who desired appellate review of the decision terminating her parental rights was forced (due to the ineffective assistance of her trial counsel) to pursue her one and only first right of appellate review (and a possible

---

[35] See *Evitts*, supra at 400-401 (III) (A) ("The right to appeal would be unique among state actions if it could be withdrawn without consideration of applicable due process norms. For instance, although a State may choose whether it will institute any given welfare program, it must operate whatever programs it does establish subject to the protections of the Due Process Clause. Similarly, a State has great discretion in setting policies governing parole decisions, but it must nonetheless make those decisions in accord with the Due Process Clause. In short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless *act* in accord with the dictates of the Constitution -- and, in particular, in accord with the Due Process Clause.") (citations omitted; emphasis supplied); *Douglas*, supra.

full appeal) without an attorney when state law entitled her to be appointed an attorney for appeal. The parent, acting pro se, filed the wrong document in taking her appeal application to this court after her court-appointed trial attorney erroneously notified her that she had no right to court-appointed counsel for appeal.[36] As the remedy for this due process violation, we acknowledge that we have jurisdiction of the discretionary appeal and, as determined previously in granting the application, we proceed to review the appeal on the merits.[37]

2. We affirm the trial court's termination of the mother's parental rights.

> In reviewing the sufficiency of the evidence supporting a termination order, we view the evidence in the light most favorable to DFCS and determine whether . . . any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost. We do not weigh the evidence or determine the credibility of the witnesses but defer to the trial court's factfinding and

---

[36] See generally *Rowland*, supra at 873 (1) ("An attorney who through negligence, ignorance, or misinterpretation of the law . . . fails to perform routine duties resulting in a dismissal of his client's appeal, thereby denying such client a right of review after conviction cannot be said to be rendering effective assistance. The result is the same as no assistance at all.") (citation omitted).

[37] See *In the Interest of A. C.*, supra; *Rowland*, supra at 875 (2) ("The out-of-time appeal is granted where the deficiency involves not the trial but the denial of the right of appeal. . . . [A]n out-of-time appeal is the remedy for a frustrated right of appeal[.]").

12

affirm unless the evidence fails to satisfy the appellate standard of review.[38]

B. R. F. was born on June 16, 2011. At the time, her mother was 17 years old (born November 23, 1993), and still living with her own father (the "grandfather"). The Department of Family and Children's Services (DFCS) became concerned that the child's needs were not being met in the home, and DFCS attempted to work the case as a "family preservation ongoing case without court intervention." But on July 19, 2011, the court entered an order for shelter care, stating therein that a complaint had been made to the court concerning the child, and that DFCS had made reasonable efforts to prevent or eliminate the need for removing the child from the home and to make it possible for the child to remain safely in the home by providing parenting services in the home to work with the mother and child for two weeks, by implementing two safety plans for supervision, and by holding family conferences and providing family preservation services. The order continued, however, that the mother had been unable to "demonstrate appropriate parenting abilities," that the grandfather had recommended that the mother's 18-year-old ex-boyfriend supervise

---

[38] *In the Interest of D. P. E.*, 282 Ga. App. 529, 530 (639 SE2d 535) (2006) (citation and footnote omitted).

13

the mother and child during the day, and that there was "no appropriate supervision of the mother and child in the home." The court placed the child in the custody of the Pike County DFCS, pending a 72-hour hearing.

On July 22, 2011, the court entered a 72-hour hearing order. The court made the following findings in its order:

> Based upon the evidence presented, . . . the Court finds that there is probable cause to believe the . . . child is deprived pursuant to OCGA § 15-11-2(8)(A): the Mother, a minor lacks appropriate parenting skills and may have some cognitive issues which could possibly be hindering her ability to grasp and demonstrate parenting skills being taught by [the parenting services company]; the maternal grandfather has been an impediment to DFCS attempting to place aid, training, resources and services in the home to assist the Mother and Child.

Notwithstanding, the court concluded that continuation in the home would not be contrary to the welfare of the child, and that "risk" could be managed with the child in the home provided that the parties strictly complied with certain conditions. Specifically, the mother and the grandfather were required to comply with a prior safety plan, which plan required that the child reside in the home of the grandfather, that the mother be supervised at all times with the child, and that the grandfather ensure that the mother had a suitable caretaker for the mother and child at all times.

14

The court also ordered the following in the July 22, 2011 order: the mother and child would be supervised at all times; the mother would submit to a psychological evaluation/parental fitness assessment; the mother and grandfather would provide DFCS with a list of at least three individuals over the age of 21 who would be available to meet with and cooperate with DFCS and who would be available to supervise the mother and child when the grandfather was at work; the grandfather could not supervise the mother and child; the mother would attend all scheduled parenting services appointments, conferences with DFCS, and services provided by DFCS; and the grandfather would not interfere with or impede DFCS's obligations to provide services, training, assistance, and targeted case management to the mother and child. The juvenile court sent the child home with her mother and grandfather with this order and safety plan in place.

With regard to the mother, on August 17, 2011, the court entered a "Consent Order for Shelter Care." The court found that based on information that had been brought before it on August 16, 2011, continuation in the grandfather's home would be contrary to the mother's welfare. The court found that it was necessary for the mother's protection that the mother be placed in shelter care

because [the mother] is 17 and has a 2 month old infant and needs help raising the infant; [DFCS] tried in-home parenting sessions through [a parenting services company]; however, due to some cognitive limitations, immaturity, and interference from the [grandfather]/sole legal guardian, [the mother] was unable to learn and/or demonstrate adequate parenting skills.

The order stated that the mother sought to be placed in a group home with her infant child, and the court directed that the mother be placed in a group home for teenaged mothers, pending a 72-hour hearing on September 1, 2011.

With regard to the child, the court entered a second shelter care order on August 24, 2011. The order stated that a petition had been filed and that an adjudicatory hearing had commenced on August 16, 2011. The court found that the mother was still unable to demonstrate the parenting skills taught to her by outside services, and that the grandfather had been an impediment to the services DFCS had been attempting to provide the mother. The court ordered that the child be placed in the custody of DFCS, pending the continuation of the adjudicatory hearing on September 1, 2011.

All the parties stipulated that the mother was deprived, and on August 18, 2011, the mother and her child were placed together in a "Second Chance Home"

where the mother could learn to care for her child. But the mother did not want to be at the group home, the grandfather continued to interfere in the mother's care of the child, and there was no evidence that the mother could parent the child alone. On September 20, 2011, the child was placed in a foster home, where the child resided as of the date of the termination hearing.

The court entered a 31-page order on November 3, 2011, nunc pro tunc to September 8, 2011, adjudicating the child deprived and awarding temporary custody to DFCS. The order stated that the matter had come before the court on August 16, 2011, September 1, 2011, and September 20, 2011 for hearings. The court adjudged the mother not deprived and released her from the custody of DFCS, as the grandfather had withdrawn his consent as to her deprivation; the mother was thus released from the group home. The order also required DFCS to prepare "concurrent permanency plans of reunification and non-reunification/live with fit and willing relatives" for the mother and father, and to set up a visitation schedule for the mother and father.[39] The court required that the mother and father comply with case plan conditions, including obtaining six months of stable housing, six months of stable income, a high school education or GED, and a psychological evaluation and parental

---

[39] The father of B. R. F. legitimated the child in October 2011.

17

fitness evaluation; neither parent had to pay child support provided they continued to be enrolled in school full-time. The court added that it was "paramount" that the parents not only fulfill the foregoing requirements, but that they show successful implementation of parenting skills they had been taught.

A case review hearing was held in April 2012, at which the mother testified that she did not believe that she was capable of caring for her child. At the conclusion of that hearing, the judge told the mother that he would allow her to decide whether she wanted services offered by DFCS and in which services she wanted to participate; at the time of the hearing, the mother had been receiving DFCS services from several different people, including "a therapist and a parent aide and then someone that was supervising [the mother] with visitation for parenting." After the hearing, the mother did not participate in any services offered by DFCS; the mother did, however, continue to visit the child. A few months later, in July 2012, the mother went to the offices of the grandfather's attorney and, without the knowledge of her own attorney, signed documents surrendering her parental rights to the grandfather.[40] DFCS thereafter terminated the mother's visitations with the child, and there was no further

---

[40] The grandfather had filed in superior court a petition to adopt B. R. F. and B. R. F.'s father surrendered his parental rights to DFCS.

18

contact between DFCS and the mother. Although DFCS had initially asked for a reunification permanency plan, in July 2012, DFCS requested a change to a concurrent reunification and non-reunification/adoption plan.

On September 24, 2012, DFCS filed a petition to terminate the mother's parental rights to the child. A hearing was held over the course of several days in December 2012. At the termination hearing, a DFCS social services administrator testified that she had been involved in B. R. F.'s case since the beginning. The social services administrator testified that when the case began, the grandfather would not allow the mother to cooperate with DFCS; the grandfather did not want DFCS involved. He would not allow DFCS to speak with the mother outside the presence of her attorney, and he would tell the mother not to cooperate with the in-home parent aide or to do something contrary to what the in-home parent aide was telling the mother to do.

Concerning whether the mother had completed her case plan goals, the social services administrator testified that the mother had completed a psychological and parental fitness evaluation, but that she had not followed all the recommendations of the psychological evaluation. Specifically, the mother had not shown proof that she had followed up on a mental health diagnosis that required her to take medication,

19

and had not shown proof that she had been seen or was being seen by a therapist. The mother had completed parenting classes, but she was unable to implement what she had been taught. The mother attended weekly scheduled visitations with her child but there were issues with her attentiveness and her responsiveness during the visitations. For instance, the mother would send text messages on her cell phone during the entire visit, or would not be fully engaged with the child. The mother did not obtain and maintain a source of income; the mother did not obtain and maintain stable, clean and safe housing approved by DFCS; and the mother had not completed high school or a GED program. The mother had had no contact with DFCS since she had executed the surrender of parental rights documents.

The psychologist who conducted the psychological and parental fitness evaluation of the mother on August 24, 2011 wrote in his report that the mother had described her relationship with the grandfather as "amazing. I'm a daddy's girl." When the psychologist asked the mother what she had learned in her parenting classes and at the group home, the mother replied that she did not know. With regard to the mother's mental health history, the mother told the psychologist that when she was 14 or 15 years old, she had taken a certain drug "for ADHD," and that she just stopped taking it because it "wasn't doing anything." But the psychologist noted that

the drug the mother had specified was not a medication that was commonly prescribed for ADHD. The mother described her own mood as "Bitchy," stating that that was "just my personality."

The psychologist wrote that the mother generally came across as "extraordinarily immature, with mannerisms and speech that usually is seen in much younger children," and that the mother gave nonsensical responses to some questions. The psychologist wrote that "in spite of [the mother's] being coherent and reasonably articulate, [her] diction, nonverbal gestures, and overall presentation suggested the possibility of cognitive deficits." The psychologist wrote that it was of extreme concern to him that throughout the evaluation, the mother had expressed frustration with having to care for her baby "round the clock," noting that the child cried and that the crying kept her up at night. The mother had complained about nearly all aspects of caring for the infant child, and more than once asked whether the evaluation could be extended so that she could delay having to return to the group home and being saddled with the responsibility of caring for her child.

The psychologist reported that the mother's IQ test results were in the average range, which seemed to indicate the absence of any cognitive or intellectual deficits that would inherently prevent her from potentially exercising adequate judgment or

21

making sound parenting decisions, but the mother's responses to certain questions suggested the potential for extremely poor judgment. The psychologist recommended that the mother participate in individual therapy, and obtain diagnostic clarification of mental health needs she may have. The psychologist cautioned that any plan for the mother to independently care for the child should be undertaken with "extremely high degrees of caution."

A therapist whom the grandfather had contacted in August 2012 testified that he (the therapist) had had four sessions with the mother, and that the grandfather had accompanied the mother to the sessions. The therapist testified that it was his impression that the mother "knows she's not ready for [parenting] and that she knows that someone else is going to be – do that [sic]," that the mother was "pretty immature" and did not "have a real good understanding . . . of moving toward independence," and that in his opinion, the mother did not have the ability to care for a baby and had told him so.

At the time of the termination hearing, the mother lived with the grandfather. She testified that she had executed documents surrendering her parental rights in favor of her father (the grandfather) so that the child could "stay . . . with the family," and that she would be an "assistant person" to the grandfather, or a "big sister" to the

22

child, but not the child's primary caregiver. DFCS had conducted a home placement evaluation of the grandfather's home, but did not approve the home as a placement resource for B. R. F.

In rendering its judgment, the juvenile court first addressed DFCS's contention that the mother's voluntary surrender of her parental rights to the grandfather was invalid. At the termination hearing, DFACS argued, and the juvenile court ultimately agreed, that the mother had surrendered her rights only to avoid completing her court-ordered reunification goals and as a subterfuge to avoid the involuntary termination of her parental rights, with the hope that she could maintain control of B. R. F. through the grandfather.[41] The court continued with the termination hearing, and thereafter terminated the mother's parental rights.

On appeal, the mother contends that a reasonable finder of fact could not have found by clear and convincing evidence that: she was the cause of the child's deprivation for the requisite amount of time; any deprivation suffered by the child was likely to continue or likely not to be remedied; and deprivation would cause or was likely to cause serious physical, mental, or emotional harm to the child.

---

[41] The juvenile court found that the biological father's surrender of his parental rights was voluntarily given and not later revoked.

To prove that parental rights ought to be terminated, [DFCS] first must prove "parental misconduct or inability" by clear and convincing evidence.[42] Such proof requires [DFCS] to establish that (1) the child is deprived; (2) the deprivation results from a lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[43] Where [DFCS] carries this burden, it then must prove that termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.[44]

(a) *Parental Misconduct or Inability*. The mother contends that a reasonable finder of fact could not have found by clear and convincing evidence that she was the cause of the child's deprivation as required pursuant to former OCGA § 15-11-94 (b) (4) (A) (ii). She asserts that the child was deprived due to the grandfather's conduct; that DFCS did not do enough to assist her in gaining independence from the

---

[42] OCGA § 15-11-94 (a) (2012).

[43] See OCGA § 15-11-94 (b) (4) (A) (i)-(iv) (2012).

[44] *In the Interest of M. S. S.*, 308 Ga. App. 614, 620 (2) (708 SE2d 570) (2011) (citations and punctuation omitted).

24

grandfather; and that there was no evidence that she had failed to comply with the reunification plan for at least a year prior to the filing of the termination petition.

(i) *Deprivation*. The juvenile court previously adjudicated the child to be deprived and, in the order terminating the mother's parental rights, took judicial notice of its deprivation order. As the mother never appealed the deprivation finding, she is now bound by it.[45]

(ii) *Lack of proper parental care or control caused the deprivation*. The mother's claim that a reasonable factfinder could not have found by clear and convincing evidence that she had unjustifiably failed to comply with the court's reunification plan and that the deprivation was due to the acts and omissions of the "Mother as opposed to Grandfather" lacks merit.

Although the grandfather initially impeded the mother from cooperating with DFCS, when the mother turned 18 years old on November 23, 2011, she was able to (and did) attend parenting classes offered by DFCS. Moreover, the mother attended scheduled supervised visits with the child. But in April 2012, she testified that she was not capable of taking care of B. R. F., she elected to stop receiving services

---

[45] See *In the Interest of J. S. B.*, 277 Ga. App. 660, 661 (2) (a) (627 SE2d 402) (2006).

25

DFCS offered, and shortly thereafter, she executed documents surrendering her parental rights. The mother told her therapist that she did not have the ability to care for her child, and there was ample testimony that the mother was immature and, ultimately standing alone, was not capable of mastering and utilizing the necessary skills to meet her parenting obligations.[46]

Moreover, the evidence showed that the mother did not complete her case plan. She had not followed all the recommendations of the psychological evaluation, in that she failed to show proof that she had followed up on a mental health diagnosis that required her to take medication; she had not completed high school or a GED program; she was inattentive during visits with the child; she still lived with the grandfather and had not obtained and maintained stable, clean and safe housing approved by DFCS; and most importantly, the mother was unable to implement the parenting skills she had been taught.[47]

---

[46] See *In re A. R.*, 302 Ga. App. 702, 710 (1) (c) (691 SE2d 402) (2010) ("The test in determining termination of parental rights, . . . is whether the mother, ultimately standing alone, is capable of mastering and utilizing the necessary skills to meet her parenting obligations.") (citations, punctuation, and footnotes omitted).

[47] See id. ("Finally, and perhaps most importantly, we note that even when construed in her favor, the testimony of the psychologist and the witnesses called to testify on the mother's behalf shows that the mother could parent the children *only* with some type of assistance."); *In the Interest of Z. H. T.*, 302 Ga. App. 424, 429 (1)

The mother complains that DFCS did not do enough to assist her in gaining independence from the grandfather. But there was no evidence that the mother, who described herself as a "daddy's girl," wanted to be independent of the grandfather.

Before she turned 18 years old, the mother and child were placed in a group home for teenaged mothers so that the mother could learn to care for her child. But the mother did not willingly go to the group home, and while there, she complained about parenting tasks. After the mother turned 18 years old, she testified that she wanted the grandfather to adopt B. R. F., and that she desired to live in the grandfather's home and act as an assistant to him in caring for B. R. F., but not as the child's primary caregiver. Moreover, in April 2012, the mother stopped participating

---

(a) (691 SE2d 292) (2010) ("Where, as here, the children have been removed from parental custody, DFCS may prove current deprivation by showing that, if the children were returned to their mother at the time of the hearing, they would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing."); *In the Interest of H. F. G.*, 281 Ga. App. 22, 26, 27 (1) (635 SE2d 338) (2006) (although the mother had completed most of her case plan goals and wished to be part of her child's life, the evidence showed that she lacked the mental capacity to care for the child without "around-the-clock assistance from others," something DFCS was not obligated to provide; given the mother's mental capacity, her inability to care for her child by herself, and the fact that the child's foster parents wished to adopt him, the juvenile court did not abuse its discretion in finding that termination of the mother's parental rights served the best interests of the child).

in services provided by DFCS and declined the court's offer to receive DFCS services; yet she later went with the grandfather to see a therapist.

The mother observes that the case plan order was entered on November 3, 2011, yet the petition to terminate her parental rights was filed less than a year later, on September 24, 2012.

Former OCGA § 15-11-94 (b) (4) (C) (iii) (2012) provided that in addition to the considerations in subparagraph (B) of OCGA § 15-11-94 (b) (4) (2012),

> where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights . . . to comply with a court ordered plan designed to reunite the child with the parent or parents. . . .[48]

"[E]ven if the reunification plan has been in effect for less than one year, a termination of parental rights may be warranted by other factors."[49] "The court should remain mindful that the time limitation in former OCGA § 15-11-94 (b) (4) (C) is

[48] *In the Interest of C. A. S.*, 308 Ga. App. 757, 760 (2) (708 SE2d 655) (2011).

[49] Id. (citation and punctuation omitted).

28

designed to give the parent whose rights are subject to termination sufficient time and opportunity to demonstrate his or her ability to comply with the terms of the court's order."[50]

Here, despite all parenting and reunification services provided, in April 2012 the mother testified that she was not capable of caring for B. R. F., she declined further services by DFCS, and shortly thereafter, she executed surrender of parental rights documents. Once given the opportunity to reside with the child away from the grandfather and to learn parenting skills, the mother complained and sought to avoid her parental responsibilities. The mother later expressed to her therapist that she was unable to care for B. R. F., and she continued to reside with the grandfather, whose home DFCS did not approve as a placement resource for B. R. F. The mother's actions were contrary to any desire to parent B. R. F., or to follow the court's orders, thus obviating the need for DFCS to wait approximately six more weeks before moving to terminate her parental rights.[51]

---

[50] *Alizota v. Stanfield*, 329 Ga. App. 550, 558 (765 SE2d 707) (2014) (punctuation and footnote omitted).

[51] See generally *In the Interest of C. A. S.*, supra.

(iii) *Cause of the deprivation is likely to continue*. The mother contends that a reasonable finder of fact could not have found by clear and convincing evidence that any deprivation suffered by the child was likely to continue or likely not to be remedied.

The mother testified that she was not capable of taking care of B. R. F.; she told her therapist that she was unable to care for B. R. F.; and the therapist testified that the mother was immature and, in his opinion, did not have the ability to care for a baby.

> Here, the evidence showed that despite her good intentions, the mother has never successfully parented the [child] alone, and . . . there was more than clear and convincing evidence that the mother [was] simply not capable of fulfilling her parenting obligations. Thus, the court was entitled to infer from the evidence that, despite the best efforts of [DFCS] . . . , the same pattern of deprivation would continue if the [child] were reunited with [her] mother.[52]

Moreover, at the time of the termination hearing, the mother resided in the grandfather's home, from which B. R. F. had been removed in the first place, and DFCS did not approve that home as a placement resource for the child.

---

[52] *In the Interest of A. R.*, supra at 710 (1) (d) (citations, punctuation, and footnotes omitted).

(iv) *Continued deprivation is likely to cause harm*. The mother contends that a rational trier of fact could not have found by clear and convincing evidence that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the child.[53] The DFCS social services administrator and the psychologist testified that the child, who had been in foster care for 16 months, needed permanency, something that was unattainable in the mother's care. The social services administrator testified to the great emotional trauma suffered by a child "in limbo." B. R. F. had bonded with her foster parents, who wanted to adopt the child.

> The juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child[ ]. Indeed, children need permanence of home and emotional stability or they are likely to suffer serious emotional problems. A caseworker's testimony about the need for permanency may be considered. The evidence sufficed on this factor.[54]

"[T]he same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also

---

[53] See OCGA 15-11-94 (b) (4) (A) (iv) (2012).

[54] *In the Interest of M. C. L.*, 251 Ga. App. 132, 136 (1) (b) (553 SE2d 647) (2001) (punctuation and footnotes omitted).

31

support a conclusion that continued deprivation would likely cause the child serious harm."[55] "Based on the [mother's] past behavior and [her] unwillingness and inability to comply with significant requirements of [her] case plan, we find that a rational factfinder could have found by clear and convincing evidence that giving custody to [the mother] would seriously harm the child."[56]

(b) *Best interest of the child*. As for the second prong of the termination analysis, the mother does not challenge the juvenile court's finding that termination of her parental rights was in the best interest of the child. Notwithstanding, we are persuaded that the evidence showed that termination of the mother's parental rights was in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and "need for a secure and stable home."[57]

---

[55] *In the Interest of A. E.*, 314 Ga. App. 206, 209 (2) (c) (723 SE2d 499) (2012) (citation and punctuation omitted).

[56] *In the Interest of D. O. R.*, 287 Ga. App. 659, 663 (1) (iv) (653 SE2d 314) (2007).

[57] *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005).

"The same evidence showing parental misconduct or inability may, and here does, establish this requirement."[58] A child needs permanency, stability, and a safe environment, which the mother cannot provide.[59] "The juvenile court was authorized to consider the [child's] need for a stable home situation and the detrimental effects of prolonged foster care."[60] The DFCS social services administrator and the psychologist testified that the child, who had been in foster care for more than a year, needed permanency. "Given this evidence, and having reviewed the entire record in this case, we find that there is sufficient clear and convincing evidence to support the juvenile court's decision to terminate the mother's parental rights."[61]

*Judgment affirmed. Barnes, P. J., and Ellington, P. J., concur. McFadden, J., concurs fully and specially. Andrews, P. J., Ray and McMillian, JJ., dissent.*

---

[58] *In the Interest of T. J.*, 281 Ga. App. 673, 675-676 (1) (637 SE2d 75) (2006) (citations and punctuation omitted); see *In the Interest of M. L. P.*, 236 Ga. App. 504, 510 (1) (d) (512 SE2d 652) (1999) (juvenile court has broad discretion in determining how the interest of the child is best served).

[59] See *In the Interest of T. J.*, supra at 676 (1).

[60] Id. (citation and punctuation omitted).

[61] Id.; see *In the Interest of A. E.*, supra at 210 (2) (d); *In the Interest of D. O. R.*, supra at 663 (2).

A14A1536. IN THE INTEREST OF B. R. F., a child.

MᴄFᴀᴅᴅᴇɴ, Judge, concurring fully and specially.

I join fully in the majority opinion and write separately to explain that our exercise of jurisdiction over the merits is mandated by *Lassiter v. Dept. of Social Svcs. of Durham County*, 452 U. S. 18 (101 SCt 2153, 68 LEd2d 640) (1981).

The Supreme Court of the United States has repeatedly drawn boundaries beyond which state termination-of-parental-rights proceedings may not trespass. It has held that parental rights may not be terminated upon less than clear and convincing evidence, *Santosky v. Kramer*, 455 U. S. 745, 769-770 (IV) (102 SCt 1388, 71 LEd2d 599) (1982), and it has held that a state may not condition appeals from terminations of parental rights on the ability to pay record preparation fees. *M.L.B. v. S.L.J.*, 519 U. S. 102, 119-124 (V) (117 SCt 555, 136 LEd2d 473) (1996) (reaffirming that courts must resist the "feeble enticement of the civil label-of-convenience") (citation and punctuation omitted).

And, contrary to the dissent, the Supreme Court of the United States recognized a due process right to counsel in termination cases in *Lassiter v. Dept. of Social Svcs. of Durham County*, 452 U. S. 18. It is true that *Lassiter* does not recognize an unqualified right to counsel. Indeed, it recognizes a "presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived

of his physical liberty." Id. at 26-27 (II) (A). But the holding of *Lassiter* is that this presumption can be overcome: "It is against this presumption that all other elements in the due process decision must be measured." Id. at 27 (II) (A).

As to the performance of this measurement, *Lassiter* identifies

three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.

452 U. S. at 27 (II) (B) (citation omitted).

The *Lassiter* court first analyzed those factors as to termination cases generally. It summarized that analysis as follows.

[T]he parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

2

452 U. S. at 31 (II) (C).

Having determined that appointed counsel could be, but would not always be required by due process, 452 U. S. at 31 (II) (C), the *Lassiter* court turned to the facts of individual cases, particularly the risk of an erroneous termination, and held that the risk of error is to be evaluated on a case-by-case basis. "[T]he decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings [is] to be answered in the first instance by the trial court, subject, of course, to appellate review." Id. at 32 (II) (C) (citation omitted).

"Nevertheless, because child-custody litigation must be concluded as rapidly as is consistent with fairness," the Supreme Court went on to decide "whether the trial judge denied Ms. Lassiter due process of law when he did not appoint counsel for her." 452 U. S. at 32 (III). The Court noted at the outset of its opinion that a year after her child was taken, "Ms. Lassiter was charged with first-degree murder, was convicted of second-degree murder, and began a sentence of 25 to 40 years of imprisonment." Id. at 20 (I) (footnote omitted). It set out an analysis of the evidence presented at the termination hearing, which is quoted in the margin,[1] and found that

---

[1] The Supreme Court analyzed the evidence in *Lassiter* as follows:

The respondent represents that the petition to terminate Ms.

3

Lassiter's parental rights contained no allegations of neglect or abuse upon which criminal charges could be based, and hence Ms. Lassiter could not well have argued that she required counsel for that reason. The Department of Social Services was represented at the hearing by counsel, but no expert witnesses testified, and the case presented no specially troublesome points of law, either procedural or substantive. While hearsay evidence was not doubt admitted, and while Ms. Lassiter no doubt left incomplete her defense that the Department had not adequately assisted her in rekindling her interest in her son, the weight of the evidence that she had few sparks of such an interest was sufficiently great that the presence of counsel for Ms. Lassiter could not have made a determinative difference. True, a lawyer might have done more with the argument that William should live with Ms. Lassiter's mother – but that argument was quite explicitly made by both Lassiters, and the evidence that the elder Ms. Lassiter had said she could not handle another child, that the social worker's investigation had led to a similar conclusion, and that the grandmother had displayed scant interest in the child once he had been removed from her daughter's custody was, though controverted, sufficiently substantial that the absence of counsel's guidance on this point did not render the proceedings fundamentally unfair. Finally, a court deciding whether due process requires the appointment of counsel need not ignore a parent's plain demonstration that she is not interested in attending a hearing. Here, the trial court had previously found that Ms. Lassiter had expressly declined to appear at the 1975 child custody hearing, Ms. Lassiter had not even bothered to speak to her retained lawyer after being notified of the

4

evidence substantial enough that the absence of counsel did not render the proceedings fundamentally unfair. Id. at 32-33 (III).

In order to apply *Lassiter* to Georgia terminations of parental rights generally, we must address two ways in which current Georgia law differs from the North Carolina law analyzed in *Lassiter*. First, as the majority acknowledges, Georgia has established a statutory right to appointed counsel in termination cases, former OCGA § 15-11-98, current OCGA § 15-11-262, and that statutory right has been authoritatively construed to include appellate counsel. *Nix v. Dept. of Human Resources*, 236 Ga. 794, 795-796 (225 SE2d 306) (1976). The denial of appellate counsel in this case was in violation of former OCGA § 15-11-98. So that statute and its successor extinguish any pecuniary interest or interest in informal procedures that

---

termination hearing, and the court specifically found that Ms. Lassiter's failure to make an effort to contest the termination proceeding was without cause. In view of all these circumstances, we hold that the trial court did not err in failing to appoint counsel for Ms. Lassiter.

452 U. S. at 32-33 (III) (footnote omitted). The Court added in a footnote, "Ms. Lassiter's argument here that her mother should have been given custody of William is hardly consistent with her argument in the collateral attack on her murder conviction that she was innocent because her mother was guilty." Id. at 33 n. 8 (III) (citation omitted).

5

the state might otherwise have been entitled to assert. Per force the state can have no due process interest in an unlawful denial of a statutory right.

Second, terminations of parental rights are now subject to our discretionary appeal procedure. OCGA § 5-6-35 (a) (12). By subjecting termination of parental rights to that procedure, Georgia has greatly increased "the complexity of the proceeding." *Lassiter*, 452 U. S. at 31 (II) (C).

Those features of Georgia law constitute a strong argument for the proposition that, under *Lassiter*, due process categorically mandates appointment of counsel for all appeals from terminations of parental rights in this state. But we need not decide that issue today. Although ultimately we are not persuaded by the arguments presented by the mother's appellate counsel that the termination before us was error, nevertheless those arguments were substantial. Consequently, this is a case in which – applying settled law handed down by the Supreme Court of the United States – we must find a due process violation concerning this appeal and in which we therefore have both the authority and the duty to "excuse compliance with [the] statutory requirement for [discretionary] appeal[s]." *Gable v. State*, 290 Ga. 81, 85 (2) (b) (720 SE2d 170) (2011).

6

A14A1536. IN THE INTEREST OF B. R. F., a child.

MCMILLIAN, Judge, dissenting.

Because I believe that this Court lacks jurisdiction to consider the mother's out-of-time appeal, I must respectfully dissent.

As the majority correctly notes, applications for discretionary appeal must be filed within 30 days of the entry of the order being appealed. OCGA § 5-6-35 (d). And a party's failure to meet this statutory deadline deprives us of jurisdiction to consider the application. *Wilson v. Carver*, 252 Ga. App. 174 (555 SE2d 848) (2001), overruled in part on other grounds in *Gable v. State*, 290 Ga. 81, 85 (720 SE2d 170) (2011). This Court has long held that a trial court lacks authority to extend the time for filing a discretionary appeal. *Rosenstein v. Jenkins*, 166 Ga. App. 385 (304 SE2d 740) (1983), overruled in part on other grounds in *Gable*, 290 Ga. at 85. And we more recently held that a trial court has no authority to grant an out-of-time discretionary application from the termination of parental rights. *In the Interest of S. M. B.*, 319 Ga. App. 125 (735 SE2d 122) (2012). Because the analysis in *In the Interest of S. M. B.* does not distinguish between the authority of trial courts and appellate courts to grant an out-of-time application under these circumstances, I believe that this Court likewise does not have the authority to grant an out-of-time application for a discretionary appeal even in a parental rights termination case.

The United States Supreme Court has held that there is no federal constitutional right to counsel in a parental rights termination case, and the mother does not contend otherwise. *Lassiter v. Dept. of Social Svcs. of Durham County*, 452 U.S. 18 (101 SCt 2153, 68 LE2d 640) (1981). Nonetheless, I agree with the majority that an indigent parent has a statutory right to the appointment of counsel to appeal an order terminating his or her parental rights pursuant to OCGA § 15-11-262 (a).[1] It bears emphasis, however, that this right to counsel in termination proceedings is statutory, rather than constitutional. See *Dell v. Dell*, 324 Ga. App. 297, 302 (2) (748 SE2d 703) (2013); *In the Interest of A. M. R.*, 230 Ga. App. 133, 136 (2) (495 SE2d 615) (1998) ("No state or federal constitutional right to counsel is involved because a parental termination action is a civil matter, not a criminal proceeding."); *In the Interest of Z. K.*, 285 Ga. App. 150, 150 (645 SE2d 637) (2007) (physical precedent only), overruled in part on other grounds, *In re J. M. B.*, 296 Ga. App. 786 (676 SE2d 9) (2009).

Thus, the question becomes whether the failure to provide statutorily required counsel to the mother following the termination proceeding gives us authority to

---

[1] See also former OCGA § 15-11-98, which was in effect at the time of the termination proceeding in this case.

grant her out-of-time discretionary application. In *Gable,* our Supreme Court addressed a similar question of whether a trial court has the authority to grant an out-of-time discretionary appeal from the denial of an extraordinary motion for new trial in a criminal case where counsel failed to timely file a discretionary application. *Gable,* 290 Ga. at 82 (1). The Court first considered that courts may grant extensions of time for filing notices of appeal and other similar papers by statute, and consequently found that this Court had the authority to grant an extension of time to file a discretionary application so long as the extension request is timely filed. Id. at 84-85 (2). But the Supreme Court emphasized that appellate courts have no authority to create equitable exceptions to jurisdictional requirements imposed by statute, and thus, "Georgia courts may excuse compliance with a statutory requirement for appeal only where necessary to avoid or remedy a *constitutional* violation *concerning the appeal*." (Emphasis supplied.) Id. at 85 (2).

And while I agree that "parents have a fundamental liberty interest in the care, custody, and management of their children"[2] and are certainly guaranteed due process

---

[2] *Clark v. Wade*, 273 Ga. 587, 593 (544 SE2d 99) (2001). See also *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013) ("there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship") (citations omitted).

in the context of the trial court's termination proceedings, there is no corresponding constitutional right to a direct appeal of the termination. When the General Assembly enacted OCGA § 5-6-35 (a) (12), which took effect on January 1, 2008, the procedure for appeals from orders terminating parental rights was changed from direct to discretionary. See *In the Interest of A. C.*, 285 Ga. 829, 832 (1) (686 SE2d 635) (2009) (finding the statute does not violate a parent's equal protection rights). Shortly thereafter, our Supreme Court upheld the change in procedure as constitutional and not in violation of the parents' due process rights, finding that

> it is well settled that if a full and fair trial on the merits is provided, the Due Process Clause of the Fourteenth Amendment does not require a State to provide appellate review, . . . even in termination of parental rights cases. Indeed, there is no right to appeal granted by either the State or Federal Constitutions to civil litigants or to the defendant or the State in criminal cases.

*In the Interest of N. A. U. E.*, 287 Ga. 797, 797 (700 SE2d 393) (2010). And relying on our Supreme Court's decision in *Gable*, this Court has previously held that because the father did not have a constitutional right to file a first appeal following the termination of his parental rights, no out-of-time appeal was available even where the father alleged that his counsel deprived him of the opportunity to timely file his

4

discretionary application. *In the Interest of S. M. B.*, 319 Ga. App. at 127; see also *Gable*, 290 Ga. at 86 (2) ("There is no constitutional right to counsel, much less the effective assistance of counsel, in filing or litigating a post-conviction extraordinary motion for new trial or a discretionary application to appeal the ruling on such a motion.").

If a parent has no constitutional or statutory right to a direct appeal following the termination of his or her parental rights, and if a parent has no constitutional right to counsel in a parental rights termination case, I fail to see how, as the majority insists, a parent nonetheless has a constitutional right to an attorney to file a discretionary application on his or her behalf. I believe the majority's holding is at odds with established precedent that we have no authority to grant an out-of-time appeal even where the appellant's attorney was ineffective in failing to timely file the application. See *Gable*, 290 Ga. at 82; *In the Interest of S. M. B.*, 319 Ga. App. at 128.

Thus, although I sympathize with the majority's position that it is a violation of due process for "an indigent person who desired appellate review of the decision terminating her parental rights [to be] forced (due to the ineffective assistance of her trial counsel) to pursue her one and only first right of appellate review (and a possible full appeal) without an attorney," the United States Supreme Court has held that there

5

is no categorical right to counsel in a parental rights termination case under the due process clause of the federal Constitution. *Lassiter*, 452 U.S. at 31 (II) (C); see also *Miller v. Deal*, 295 Ga. 504, 509 (2) (761 SE2d 274) (2014) (under *Lassiter*, "no categorical right to appointed counsel in proceedings to terminate parental rights"). And our Supreme Court has not construed our State's Constitution in that way. Thus, it is outside this Court's jurisdiction to find such a due process right in the first instance. See *City of Decatur v. DeKalb County*, 284 Ga. 434, 437 (2) (668 SE2d 247) (2008) ("Because [the Supreme Court of Georgia] has exclusive appellate jurisdiction over cases involving the construction of the state constitution, the Court of Appeals erred when it construed the constitutional provision.").

I am, though, deeply troubled that the mother, who was herself barely an adult at the time of the termination proceedings, was erroneously told by her trial counsel that she did not have the right to appointed counsel on appeal.[3] And although I am compelled to find that she has no constitutional right to counsel on appeal based upon the state of Georgia law as it currently exists, I nonetheless echo the United States Supreme Court's sentiments that "[a] wise public policy, however, may require that

---

[3] Nor did the juvenile court appoint her appellate counsel once her trial counsel informed the court that his contract with the public defenders office did not encompass appellate work.

6

higher standards be adopted than those minimally tolerable under the Constitution." *Lassiter,* 452 U.S. at 33. Those considerations, however, are best left for our legislature's determination.

Because I believe that this Court has no authority to grant the mother's out-of-time discretionary application from the termination of her parental rights, I would find that her application was improvidently granted and that her appeal should be dismissed.

2. Based on my conclusion that this Court lacks jurisdiction to address the merits of this case, I do not reach the mother's remaining enumerations of error, which are addressed in Division 2 of the majority's opinion.

I am authorized to state that Presiding Judge Andrews and Judge Ray join in this dissent.